**UNITED STATES of America**

**v.**

**Melvin Douglas LIGHTFOOT, a/k/a Douglas Williams, Appellant.**

**No. 73–1785.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 19, 1974.

Decided Oct. 18, 1974.

Rehearing Denied Dec. 2, 1974.

Eric P. Neuman* (Student Counsel) with whom Sherman L. Cohn and William H. Rodgers, Jr., Washington, D. C. both appointed by this Court, were on the brief for appellant. Frederick E. Martin* and Robert Schlacter* (Student Counsel) also entered appearances for appellant.

Julius A. Johnson, Asst. U. S. Atty. with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty. were on the brief, for appellee. Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and Steven R. Schaars, Asst. U. S. Atty. also entered appearances for appellee.

Before McGOWAN, and TAMM, Circuit Judges, and EDWARDS,** United States Circuit Judge for the Sixth Circuit.

* Entered appearances as Student Counsel pursuant to Rule 20 of the General Rules of this Court.

** Sitting by designation pursuant to 28 U. S.C. § 291(a).

PER CURIAM.

Defendant-appellant Melvin Lightfoot was found guilty after jury trial of a variety of crimes ranging from pandering (D.C.Code Ann. § 22–2705 (1973)) and violating the Mann Act (18 U.S.C. § 2421 (1970)) to receiving stolen property (D.C.Code Ann. § 22–2205 (1973)). Into the bargain the government charged him with and convicted him on one count of interstate travel with intent to distribute the proceeds of illegal activity (18 U.S.C. § 1952 (1970)).

Since there is ample evidence from which the jury could have found guilt beyond a reasonable doubt as to all five counts charging the first three violations referred to above, and we find no reversible error in the trial itself, our primary concern is appellant's conviction for violation of the interstate travel act. This statute in applicable part provides:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, . . . ." 18 U.S.C. § 1952 (1970).

It appears to us that Congress was seeking to prevent racketeers from engaging in interstate travel to further the purposes of concerted illegal activity. This purpose was made clear by Attorney General Robert Kennedy's testimony in support of the bill:

"We are seeking to take effective action against the racketeer who conducts an unlawful business but lives far from the scene in comfort and safety, as well as against other hoodlums.

"Let me say from the outset that we do not seek or intend to impede the travel of anyone except persons engaged in illegal businesses as spelled out in the bill. . . .

"The target clearly is organized crime. The travel that would be banned is travel 'in furtherance of a business enterprise' which involves gambling, liquor, narcotics, and prostitution offenses or extortion or bribery. Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise.

\* \* \* \* \* \*

"Our investigations also have made it quite clear that only the Federal Government can shut off the funds which permit the top men of organized crime to live far from the scene and, therefore, remain immune from the local officials." S.Rep.No.644, 87th Cong., 1st Sess., 2–3 (July 27, 1961).

In the Supreme Court's first contact with this statute, Chief Justice Warren said:

"The Travel Act formed part of Attorney General Kennedy's legislative proposals to combat organized crime. See Hearings on S. 1653–1658, S. 1665 before the Senate Judiciary Committee on the Attorney General's Program to Curb Organized Crime and Racketeering, 87th Cong., 1st Sess. (1961). The Attorney General told

the Senate Committee that the purpose of the Travel Act was to aid local law enforcement officials. In many instances the 'top men' of a given criminal operation resided in one State but conducted their illegal activities in another; by creating a federal interest in limiting the interstate movement necessary to such operations, criminal conduct beyond the reach of local officials could be controlled." United States v. Nardello, 393 U.S. 286, 290–291, 89 S.Ct. 534, 537, 21 L.Ed.2d 487 (1969).

The opinion also noted:

"The Travel Act, primarily designed to stem the 'clandestine flow of profits' and to be of 'material assistance to the States in combating pernicious undertakings which cross State lines,' thus reflects a congressional judgment that certain activities of organized crime which were violative of state law had become a national problem. The legislative response was to be commensurate with the scope of the problem." *Id.* at 292, 89 S.Ct. at 538. (Footnote omitted.)

In Rewis v. United States the Court said:

" § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another. In addition, we are struck by what Congress did not say. Given the ease with which citizens of our Nation are able to travel and the existence of many multi-state metropolitan areas, substantial amounts of criminal activity, traditionally subject to state regulation, are patronized by out-of-state customers. In such a context, Congress would certainly recognize that an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies. It is not for us to weigh the merits of these factors, but the fact that they are not even discussed in the legislative history of § 1952 strongly suggests that Congress did not intend that the Travel Act should apply to criminal activity solely because that activity is at times patronized by persons from another State. In short, neither statutory language nor legislative history supports such a broad-ranging interpretation of § 1952. And even if this lack of support were less apparent, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity, Bell v. United States, 349 U.S. 81, 83, 75 S. Ct. 620, 99 L.Ed. 905 (1955)." Rewis v. United States, 401 U.S. 808, 810–811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

With these purposes and background for the statute in mind, we find no justification for its application to our instant case.

■ The government's proofs show that defendant-appellant bought an automobile (a Cadillac) from a dealer in Maryland and subsequently drove it to the District of Columbia. There isn't the slightest suggestion that the dealer from whom defendant purchased the Cadillac was part of or even privy to knowledge about defendant's illegal activity. It is the sum total of the government's case on this score that the funds with which defendant paid for the Cadillac were derived from prostitution— one of the organized crime offenses specifically referred to in the statute—and, hence, that his purchase represented "distribut[ing] the proceeds of [an] unlawful activity."

The word "distribute" simply does not encompass the concept of buying an article in the normal course of trade:

"distribute /de'stribyet, -i(,) bytit, *chiefly in substand .speech* - bet; *usu* -d.+V/ *vb* distributed /-yed.ed,-yeted/distributed /"/ distributing /-yed.in,-yatin/ distributes /-yets,-yuts/ [ME *distributen,* fr. L *distributus,* past part. of *distribuere,* fr. *dis-*

'dis-+ *tribuere* to assign, give, allot—more at TRIBUTE] *vt* 1 a : to divide among several or many : deal out : apportion esp. to members of a group or over a period of time : ALLOT <the American Relief Administration *distributed* nearly five million tons of foodstuffs—*Current Biog.*> <the problem of how to — taxes equitably among the various economic groups—*Collier's Yr. Bk.*> <precipitation is not ample, but is *distributed* throughout the year— G. G. Weigend> b : DISPENSE, ADMINISTER <— justice> <lamented that the great fields of private law, where justice is *distributed* between man and man, should be left without a caretaker—B. N. Cardozo> 2 a : to spread out or scatter so as to cover a surface or a space <*distributing* the seed over the lawn> <*distributing* the ink evenly over the print>; *also* : to give out or deliver esp. to the members of a group <*distributing* magazines to subscribers> <the U.N. secretariat, which *distributed* a 125-page questionnaire to member governments —*Current Biog.*> b : to place or position usu. so as to be properly apportioned over or throughout an area <the blood vessels *distributed* throughout the arm> <he seems chunkier than the 175 pounds *distributed* over his five feet ten inches would indicate —W. B. Furlong> <the various factories *distributed* throughout the city —*Amer. Guide Series: N.H.*> <a widely *distributed* company —Marquis James> <our Indians are not evenly *distributed* —Juan Comas> c *logic* : to use (a term) so as to convey information about every member of the class named <the proposition 'all men are mortal' —*s* a universal affirmative subject, here 'man', but does not — the predicate> 3 a : to divide or separate esp. into classes, orders, kinds, or species : CLASSIFY, ASSORT <spend a good deal of time *distributing* his specimens into their proper classes> b (1) : to separate the units of (as typeset matter or handset

matrices) and return to the proper storage places (2) *of a keyboard slug-casting machine* : to return (matrices) automatically to the proper magazine channels — *vi* : to make distribution : spread out" Webster, Third New International Dictionary (1967).

We believe that, particularly in the context of this case, the word "distribute" carries a connotation of distribution of illegal proceeds to persons in organized crime conspiracies. Certainly the person receiving them must be entitled to them for reasons other than normal and otherwise lawful purchase and sale of goods at market prices.

Any other construction would make any person who gained his livelihood illegally, vulnerable to federal prosecution the moment he crossed a state line on vacation and bought a hamburger.

We might, of course, have a very different case if defendant had bought the car during interstate travel and given it to one of his prostitutes as compensation. Here, however, we have no such facts and as to this count the judgment of conviction is vacated.

As to the other issues presented on appeal, we find no merit.

The search warrant was issued upon an affidavit amply demonstrating probable cause to believe appellant was engaged in criminal activity and that the objects sought to be seized were both derived therefrom and used therein. The reliance upon Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), is completely inapposite. The breadth of this warrant was justified by the fact that there was evidence that the items seized were all then being employed in the crime of organized prostitution. Like *Stanford*, of course, appellant had both First and Fourth Amendment rights. But we are unable to see that any First Amendment rights were threatened or any Fourth Amendment rights were violated.

In this latter regard, we note and rely upon this Circuit's recent hold-

ing that the terms of a search warrant may be construed by reference to the circumstances disclosed in the accompanying affidavit. United States v. Thompson, 161 U.S.App.D.C. 339, 495 F.2d 165 (1974).

We also find no abuse of discretion in the District Judge's refusal to grant a new trial in this case. We do not view the affidavits relied upon by appellant as exculpatory. Assuming nonetheless they might have had some collateral value to the defense for purposes of impeachment, they are hardly in the category of newly discovered evidence which would require grant of a new trial. And we do not see how their availability at a new trial could be expected to alter the outcome.

The judgments of conviction as to all counts, except Count I, are affirmed. The judgment of conviction as to Count I is vacated and that count is remanded to the District Court for dismissal of the charge.