UNITED STATES of America,
Plaintiff–Appellee,

v.

Rafael L. CORONA, Ray L. Corona,
Defendants–Appellants.

No. 87–5952.

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

---

John W. Nields, Jr., Howrey & Simon, W. Neil Eggleston, Washington, D.C., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Linda Collins Hertz, Tom Blair, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, Chief Judge,
VANCE, Circuit Judge, and EVANS *,
District Judge.

RONEY, Chief Judge:

Defendants Ray Corona and his father, Rafael Corona, were convicted of Travel Act, mail fraud, and racketeering (RICO) charges. Ray Corona was also convicted of RICO conspiracy. Two days after the verdicts, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Pursuant to *McNally*'s limitations on the applicability of the mail fraud statutes, the district court dismissed the mail fraud counts and the mail fraud predicate acts in the RICO count, which resulted in dismissal of the RICO count as to Rafael, but not as to Ray. Rafael then stood convicted of only a Travel Act violation. The defendants appeal the remaining convictions, raising claims of insufficiency of evidence, double jeopardy, and "spill-over" effect from the dismissed mail fraud charges. We reverse as to Rafael Corona on the ground there was insufficient evidence to support the Travel Act violation. Although the court is divided in two respects, we affirm in part and reverse in part as to Ray Corona.

### Background

The Coronas' initial trial ended in a mistrial after the jury was unable to reach a verdict as to either of them. The Government obtained a superseding indictment, which the defendants sought to have dismissed on double jeopardy grounds. The district court denied the motion to dismiss, and this Court affirmed the denial in an interlocutory appeal. *United States v. Corona*, 804 F.2d 1568 (11th Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987).

On retrial, the Government's evidence showed that Jose Antonio Fernandez, a Cuban-born United States resident, initially became involved in the marijuana "broker-

age" business as a low level employee of Jose Alvaro–Cruz. A "broker" in the drug trade is a middle-man who for a fee will take on a consignment basis large shipments of drugs smuggled into this country to find a buyer for them.

In 1976 Ray Corona was Senior Vice President of the Total Bank in Miami. Rafael Corona was President of the bank. Fernandez and Ray Corona met through Alvaro–Cruz. At that time, Fernandez was starting a boutique and had virtually no source of legitimate income since the business was barely meeting operating expenses. Ray became banker for Fernandez, as well as for several of Fernandez's associates in the marijuana trade. Fernandez wanted Visa and American Express gold cards. Since he had no credit history, Ray required him to deposit $20,000. Fernandez delivered the money in cash wrapped in a paper bag.

According to Fernandez, he and his associates in the drug trade, who also banked at the Total Bank, would visit Ray and discuss "what they were doing. * * * They would joke about it. * * * [They would discuss] how much money they made. * * * [Fernandez] thought Ray came to look at [him] like part of the group." Steve Samos and Ivan Robles were Fernandez's money launderers, working out of Panama. Fernandez owned several off-shore "shell companies" in Panama and the Grand Cayman Islands through which his money was laundered.

In 1977 Fernandez, who the previous year had virtually no legitimate income and no credit history, began discussing with Ray the possibility of buying a bank. Fernandez, Alvaro–Cruz, and Ray discussed the matter at Ray's office. Initially, Alvaro–Cruz, and Fernandez proposed that each of them would contribute half the money necessary, but Alvaro–Cruz withdrew from the plan when Ray wanted a 15% share without contributing any money.

Ray Corona, Samos, and Fernandez were aware that Fernandez could not buy a bank

---

* Honorable Orinda D. Evans, U.S. District Judge for the Northern District of Georgia, sitting by designation.

under his own name due to the close scrutiny that the Comptroller of Currency would give to the proposed purchaser. Therefore, they agreed to use Alma Robles, Samos's ex-wife who was from an influential family in Panama, as the nominee or "figurehead" buyer. Ray located a bank and told Fernandez that he would need to produce $500,000 as earnest money. Fernandez gave Ray $500,000 cash. The first attempt to buy a bank was unsuccessful. Ray later told Fernandez that he could probably purchase a majority interest in the Sunshine State Bank in Miami for about $2,000,000.

Ray quit his job at the Total Bank before the Sunshine State Bank purchase was complete. Fernandez gave him a $200,000 personal loan to buy a new house and car. Fernandez, Samos, and Ray Corona were at Fernandez's Ocala horse ranch when they learned that the Sunshine State Bank purchase had been approved. After celebrating, Fernandez took $1,000,000 cash out of his safe and gave it to Ray and Samos, who took it with them back to Miami. Samos then took the money to Panama and laundered it by transferring it through numerous accounts to disguise its source. Finally, he disbursed it from Alma Robles' account and wired it back to Ray to make the purchase.

Ray Corona was made President and Chairman of the Board of the bank. Later, Rafael Corona left the Total Bank and became Chairman of the Board at the Sunshine State Bank. Ray continued as President.

Fernandez treated the bank as an investment. Although he purchased it with laundered drug proceeds, he did not launder money through it after the purchase. On Ray's recommendation Fernandez started the Cumberland Management Company as a "front" for investment purposes and established his office near the bank. Bank employees had a rubber stamp of Fernandez's signature and covered several substantial overdrafts which occurred when he was out of town.

Fernandez gave numerous presents to bank employees, including gifts to Ray Corona of two large-screen televisions valued at between three and five thousand dollars. Ray and Fernandez were social friends as well as business associates. Ray visited Fernandez's home several times, dined with him and his wife occasionally, borrowed his boat often, and sponsored him for membership in a yacht club. Eventually the friendship soured as Fernandez perceived a threat to his bank investment in Ray's erratic, extravagant lifestyle (driving a Rolls Royce, purchasing mink coats, and getting in fights at a night club).

Fernandez had stepped into the leadership void in the drug business left when Alvaro–Cruz moved to Spain due to "tax problems." Within about two years Fernandez owned a 50–acre Ocala, Florida horse ranch worth $1,000,000, seven beachfront acres including three buildings at Vero Beach, several other properties, and a $90,000 boat, all bought with his drug earnings.

Tino Guevara was Fernandez's brother-in-law and partner in the marijuana trade. In late 1979 and early 1980, after Guevara's arrest, Fernandez, already having accumulated great wealth, began to consider retiring from the drug "brokering" business. He told Ray of his thoughts of selling the bank. Ray wanted time to arrange for him and his father to buy it themselves.

Between 1976 and 1981 Fernandez made approximately five to seven million dollars "brokering" 43 shipments of marijuana totalling 1.3 million pounds worth about $200,000,000. In March 1981, soon after "brokering" what turned out to be his last shipment of marijuana, Fernandez was arrested on a federal indictment in New Orleans. Ray flew to New Orleans to visit Fernandez, ostensibly to assist with bail. Fernandez sent Ray away for fear that federal prosecutors might figure out Fernandez's relationship to the Sunshine State Bank. Back in Miami, however, Ray contacted Guido Eschevarria, a bank customer who had never met Fernandez, and persuaded him to withdraw a $100,000 certificate of deposit (even though the bank held it as collateral for an $89,000 loan) and fly to New Orleans to help Fernandez make bail.

After Fernandez's release on bail, he and his family were kidnapped by Colombian marijuana suppliers and taken to Colombia until he repaid several million dollars owed for prior drug shipments which had been taken on consignment and for which his associates had failed to pay the Colombians while Fernandez was in jail. The Colombians forced Fernandez to liquidate most of his holdings through Samos, as they essentially stripped Fernandez of his wealth.

During his captivity Fernandez was repeatedly in contact with Samos and Ray. They were negotiating for Ray and Rafael to buy Fernandez's 49,900 shares of bank stock. For the first 20,000 they sent $200,000 and a promissory note for $420,000. Ray also gave Fernandez's wife $50,000 and a car when the Colombians released her for a short time and allowed her to travel to Miami. In August 1981 Fernandez managed to escape first to Costa Rica, then to Spain, and finally to Brazil.

He continued through Samos and Ivan Robles trying to sell his remaining interest in the bank and succeeded in getting an additional $200,000 from the Coronas for 9,900 shares. In their negotiations the Coronas deducted amounts for expenses related to the New Orleans bail matter and the $50,000 previously given to Mrs. Fernandez.

Samos provided Fernandez a fake name and counterfeit documents while he was a fugitive. Ray provided Visa and American Express gold cards issued in the false name. Ray also provided Fernandez an additional $50,000 in December 1981. Ultimately, after nearly two years as a fugitive, Fernandez was apprehended in Brazil in March 1983 and extradited to the United States the following year.

In October 1983, while Fernandez was in custody in Brazil, Rafael Corona arranged to have the remaining shares of bank stock, which were registered in the name of Alma Robles, transferred to two Panamanian corporations.

In response to the Government's evidence, the Coronas' defense was that they did not know Fernandez was in the marijuana business; they did not know he, rather than Alma Robles, was the real purchaser of the Sunshine State Bank; and they did not commit any of the allegedly criminal acts attributed to them, other than Ray's trip to New Orleans, which had no criminal purpose.

The counts in the superseding indictment of which Ray Corona was convicted charged him with two Travel Act offenses: (1) the April 1981 trip to New Orleans and conduct thereafter in assisting Fernandez to make bail (Count VI), and (2) a December 1981 telephone conversation with Samos to arrange for additional payments for the bank stock and the wiring thereafter of $50,000 for Fernandez while he was a fugitive (Count VII). In the indictment's RICO counts (Counts I and II) against Ray, the Government alleged as predicate acts numerous mail fraud acts (subsequently invalidated under the *McNally* decision), the two Travel Act charges mentioned above, and three Travel Act offenses in 1977 and 1978 (now barred under the statute of limitations) involving the wiring of laundered funds from Samos to Ray to purchase the majority interest in the Sunshine State Bank for Fernandez.

The only charge in the superseding indictment of which Rafael Corona was convicted was a Travel Act offense (Count VIII) allegedly involving the mailing of documents between Panama and Miami to transfer the last 20,000 shares of Fernandez's bank stock out of Alma Robles's name and into the names of two off-shore corporations.

*Sufficiency of Evidence*

In order to establish that the Coronas were guilty of the Travel Act charges under the circumstances alleged, the Government had to prove that they were aware of Fernandez's "unlawful activity" when their acts occurred. *See United States v. Lignarolo,* 770 F.2d 971, 977 (11th Cir.1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986). The Government was also required to prove that they traveled or used a facility in interstate commerce to distribute the proceeds of the unlawful activity, 18 U.S.C. § 1952(a)(1), or

to facilitate the unlawful activity, and "thereafter" either performed or attempted to perform the intended distribution or facilitation, 18 U.S.C. § 1952(a)(3).

■ On appeal, the Court must review the evidence in a light most favorable to the Government to determine whether a reasonable fact-finder could have reached a conclusion of guilt beyond a reasonable doubt. *United States v. Sanchez*, 790 F.2d 1561, 1563 (11th Cir.1986).

The Government and the Coronas agree that with the mail fraud charges now dismissed under *McNally* the convictions either stand or fall on the Travel Act allegations.

*Travel Act:*

The Travel Act, 18 U.S.C. § 1952, identifies as subject to criminal sanctions:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

.    .    .    .    .

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified

. . . .

(b) As used in this section "unlawful activity" means (1) any business enterprise involving … narcotics or controlled substances. . . .

Thus, in a case such as this, a Travel Act conviction must be based on (a) an unlawful activity, generally termed an "enterprise"; (b) knowledge of the defendant of the unlawful activity; and (c) use of interstate commerce (1) to facilitate the carrying on of the unlawful activity or, (2) to distribute the proceeds.

**A.  *Enterprise***

■ The Government's case under the Travel Act rested on an expansive interpretation of section 1952(b)'s concept of a "business enterprise involving marijuana" to extend the enterprise until Fernandez's arrest in Brazil in March 1983. The Coronas contend that the business enterprise ended around March 1981, when Fernandez's arrest took him out of the marijuana business. Their more restrictive interpretation equates "business enterprise involving marijuana" and marijuana business, although they admit that the enterprise may encompass ancillary functions such as obtaining boats, planes, and getaway vehicles necessary to the enterprise's objectives.

When, under circumstances such as presented here, a Travel Act "enterprise" *ends* is a question of first impression. The Travel Act does not define the term "enterprise," and the case law simply describes it generally as "a continuous course of conduct, rather than a sporadic, casual course of events." *United States v. Lignarolo*, 770 F.2d at 979; *see also United States v. Jones*, 642 F.2d 909, 912 (5th Cir.1981) ("an ongoing business enterprise").[1]

The three alleged Travel Act violations occurring in 1977 and 1978, which served only as RICO predicate acts, plainly occurred during the enterprise. Even under the Coronas' restrictive reading of section 1952(b), the "enterprise" lasted until March 1981.

The enterprise continued for at least a while after Fernandez's arrest, as his confederates mismanaged the business and failed to pay the Colombians what was owed them. The day-to-day operation of a drug enterprise, like any other business, surely includes paying its debts. Ray Corona's trip to New Orleans occurred during this period and thus happened during the enterprise. Likewise, as Fernandez liquidated his holdings (bought with earlier drug proceeds) to pay the Columbians, he was meeting his organization's obligations

---

**1.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (in banc), this court adopted as binding precedent all of the deci-

sions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

to pay for the marijuana earlier taken on consignment.

The more difficult question is whether the enterprise continued while Fernandez was a fugitive, the time during which Ray Corona's December 1981 telephone conversation and subsequent mailing of funds for Fernandez occurred. Not every drug enterprise remains ongoing until each participant, no matter how minor, is apprehended. Here, however, an organizational kingpin assumed a false identity and remained a fugitive, liquidating and living off his earlier illegal earnings with the knowing assistance of his money launderer and banker, both of whom had previously facilitated either the laundering (Samos) or distribution of the proceeds (Ray Corona, as discussed later) of the kingpin's marijuana earnings. Fernandez's unlawful activity had merely moved into a new phase: avoidance of prosecution and punishment. Under these circumstances, we hold that for Travel Act purposes the "business enterprise involving marijuana" continued.

### B. *Ray Corona*

With the statute interpreted in this way, it becomes clear that all of the Travel Act violations alleged against Ray Corona occurred during the enterprise.

### C. *Rafael Corona*

The single Travel Act charge against Rafael Corona, however, involved an October 1983 event. This was after Fernandez's fugitive period ended, beyond the time when even the Government admits that the enterprise had ceased. A basic ingredient of the Government's Travel Act case against Rafael Corona was missing. His conviction cannot stand because no Travel Act "enterprise" existed when his acts occurred. Therefore, it is unnecessary to discuss the other elements which would be necessary to sustain his conviction.

### D. *Knowledge of Unlawful Activity*

■ A trier of fact could conclude that after Fernandez's indictment and March 1981 arrest on drug charges, Ray Corona was aware of Fernandez's unlawful activi-

ty. Both of his Travel Act convictions resulted from events occurring *after* Fernandez's arrest.

The additional three Travel Act offenses, which were barred by the statute of limitations but were nonetheless predicate acts in the RICO counts, occurred in 1977 and 1978, well *before* the arrest. There was, however, sufficient evidence presented at trial to establish that even at these early dates Ray Corona was aware of Fernandez's marijuana activity. Evidence, in a light most favorable to the Government, showed the following:

(1) Ray Corona was aware that Fernandez accumulated great wealth in a short time with little legitimate income.

(2) He knew that Fernandez kept at least $1,000,000 in cash in his home safe.

(3) He was aware that the cash which Fernandez used to buy the Sunshine State Bank was sent out of the country, through Samos in Panama, and back into this country, a procedure suggestive of laundering.

(4) He counseled Fernandez to use Alma Robles as "figurehead" purchaser of the bank because Fernandez would not withstand the Comptroller of Currency's scrutiny.

(5) Ray received expensive gifts and large loans form his close business associate and personal friend, Fernandez.

(6) He counseled Fernandez to use a "front" business for investment purposes.

(7) There was testimony about conversations Ray Corona had with Fernandez and his associates in the drug trade about the sources and amounts of their incomes.

Although some of the testimony, standing alone, might have appeared ambiguous, the evidence in its entirety strongly suggested that Ray Corona was aware of Fernandez's true occupation. A reasonable juror could have concluded beyond a reasonable doubt that Ray Corona knew of Fernandez's drug "brokering" when Ray helped him buy the Sunshine State Bank with laundered money.

## E. *Facilitation*

"[T]o facilitate unlawful activity within the meaning of section 1952(a)(3) means *to make easy or less difficult.*" *United States v. Rogers,* 788 F.2d 1472, 1476 (11th Cir.1986) (emphasis added). The "unlawful activity" here was a "business enterprise involving ... controlled substances." 18 U.S.C. § 1952(b). As noted, the "enterprise" continued beyond the last importation until Fernandez's arrest in March 1983 in Brazil.

### *December 1981 telephone call (Count VII)*

■ The ongoing fugitive status of Fernandez, the organizational kingpin, constituted a continuation of the enterprise. The test for determining if the December 1981 telephone call between Samos in Panama and Ray Corona in Miami and Ray's mailing thereafter of checks totalling $50,000 facilitated the continuing enterprise is whether the money "made easy or less difficult" Fernandez's fugitive status. The clear answer is that it did. The Government sufficiently proved this Travel Act charge.

### *Trip to New Orleans (Count VI)*

■ On the other hand, although Judge Evans does not agree, the Court finds that Ray Corona's trip to New Orleans after Fernandez's arrest and the arrangement thereafter for Guido Eschevarria to assist with Fernandez's bail did not facilitate any unlawful activity. There was no evidence from which the jury could have found beyond a reasonable doubt that Ray did this with the intent to facilitate either Fernandez's return to the marijuana "brokering" business or his ultimate flight from justice. The evidence does not support a conviction on this charge.

Judge Evans would affirm this conviction on the ground that a reasonable jury could have found Ray Corona's intent in helping Fernandez get out of jail was, at least in part, to facilitate Fernandez's handling of the financial affairs of the enterprise.

## F. *Distribution of Proceeds*

The three Travel Act offenses used solely as RICO predicate acts were alleged to be illegal distributions of proceeds of the enterprise. *See* 18 U.S.C. § 1952(a)(1). These three events arose from wire transfers of money from Panama to Miami in 1977 and 1978 for Fernandez's purchase of the Sunshine State Bank.

Ray Corona need not have been guilty of the marijuana distribution conspiracy to be guilty under 18 U.S.C. § 1952(a)(1) for distribution of the proceeds. Pursuant to subsection (a)(1)—

> The government need not prove that the defendant intended to facilitate the unlawful activity of the enterprise. It is sufficient that the government establish that the defendant, at the time he distributed the proceeds or conspired to do so, knew they were derived from unlawful activity.

*United States v. Rogers,* 788 F.2d at 1475–76 (citations omitted).

■ Distribution is not just the disposing of or spending of the proceeds, however, but must involve disbursement to persons who would be entitled to some proceeds from the criminal enterprise. In *United States v. Cole,* 704 F.2d 554, 558 (11th Cir.1983), this Court employed the definition of "distribution" given in *United States v. Lightfoot,* 506 F.2d 238 (D.C.Cir. 1974). *Lightfoot* explained:

> [T]he word "distribute" carries a connotation of distribution of illegal proceeds to persons in organized crime conspiracies. Certainly the person receiving them must be entitled to them for reasons other than normal and otherwise lawful purchase and sale of goods at market prices.

*Id.* at 242. The court in *Lightfoot* held that a participant in a prostitution ring did not "distribute" proceeds of the unlawful activity when he crossed into another state and purchased a car from a dealer having no knowledge of the illegal activity. The court noted, however, that it would have faced "a very different case if defendant had bought the car during interstate travel

and given it to one of his prostitutes as compensation." *Id.*

■ Here there was more than a normal purchase and sale. Ray Corona helped Fernandez buy controlling interest in a bank under extremely dishonest circumstances with laundered drug money. Such a purchase is in reality part of the laundering process. For his role in the purchase and in running the bank for Fernandez, Ray received a percentage ownership without paying any of the purchase price. In essence, Fernandez bought the bank with drug proceeds and gave a portion of it to Ray. This is precisely the distinction alluded to in *Lightfoot.* Ray Corona "was entitled to [a share of the proceeds] for reasons other than normal and otherwise lawful purchase and sale of goods at market prices." *Lightfoot,* 506 F.2d at 242; *Cole,* 704 F.2d at 558. Although Ray Corona was the *recipient,* he nonetheless was responsible under 18 U.S.C. § 2 as principal in the distribution of proceeds. *See Cole,* 704 F.2d at 558–59.

There was sufficient proof that Ray Corona participated in the distribution of proceeds knowing fully they were derived from Fernandez's marijuana "brokering" business.

### Double Jeopardy

■ Ray Corona contends that *McNally* applies retroactively to his first trial and, once applied, it invalidates all mail fraud predicate acts, thus leaving insufficient evidence to support the RICO conspiracy and substantive RICO charges, and since he purportedly was entitled to an acquittal, his retrial on the amended counts in the superseding indictment subjected him to double jeopardy.

In *Richardson v. United States,* 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the Supreme Court held that a defendant's retrial after a mistrial due to a hung jury did not subject him to double jeopardy, regardless of whether an acquittal should have been granted for insufficient evidence, because the mistrial did not terminate the original jeopardy. In the Coronas' prior appeal, we held that the mistrial due

to a hung jury in the first trial did not terminate jeopardy, and the filing of the superseding indictment prior to the second trial was permissible. *United States v. Corona,* 804 F.2d at 1570–71.

Whether *McNally*, if applied retroactively, would require acquittal on the original RICO counts is thus of no consequence for double jeopardy purposes. Jeopardy did not terminate in the original trial. The Coronas were convicted on a permissible superseding indictment. They had no vested rights in the original indictment or trial. The double jeopardy claim has no merit.

### "Spill–Over" Effect

■ In *United States v. Peacock,* 654 F.2d 339 (5th Cir.1981), *vacated in part on other grounds,* 686 F.2d 356 (5th Cir. Unit B 1982), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983), this Court addressed the question presented when a RICO count contains some invalid predicate acts, as well as some that are clearly valid. We held that if it is clear that the jury found each defendant guilty of at least two predicate acts as is necessary to meet 18 U.S.C. § 1962(c)'s "pattern of racketeering" requirement, the RICO conviction will be upheld. *Peacock,* 654 F.2d at 348.

In the present case, the RICO conspiracy and substantive RICO counts of the superseding indictment charged Ray Corona with eleven predicate acts: five Travel Act and six mail fraud offenses. The district court dismissed the mail fraud predicates and we today reverse one of the Travel Act predicates. This leaves four predicate acts, although only one of them (stemming from the December 1981 telephone call) was charged separately in a Travel Act count and resulted in a conviction. Although Judge Vance does not agree, the Court holds that the verdict leaves no doubt that the jury relied on at least two valid predicate acts.

Ray Corona concedes in his brief that "[t]he sole issue on the mail fraud charges was whether the Coronas knew that Fernandez was the true investor in the bank" and "as a practical matter, ... the mail fraud charges subsumed the Travel Act

charges." Thus, the events surrounding the mail fraud and Travel Act allegations concerning the bank stock purchase by Fernandez and subsequent sale by him to the Coronas were so intertwined that the jury could not reasonably have found that Ray Corona performed the mail fraud but not the Travel Act conduct.

Even though, given the hindsight of *McNally*, the mail fraud allegations may have been non-criminal conduct, the evidence which supported those charges was admissible under Fed.R.Evid. 404(b) "to set in proper perspective" Ray Corona's conduct as it related to the other charges and the overall scheme. *See United States v. Murphy*, 836 F.2d 248, 255 (6th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988). Since the evidence was admissible, regardless of whether the acts were criminal, Ray Corona did not suffer prejudice in having to respond to it. The central facts underlying both sets of charges were the same.

Without question, Ray was involved in the events surrounding the Sunshine State Bank transactions. He does not dispute this. The jury plainly found that Ray knew Fernandez was the person whom Ray helped buy the bank stock and from whom Ray later purchased it. The jury could not reasonably have relied on the now-dismissed mail fraud predicate acts concerning these events without also finding Ray Corona guilty of the related Travel Act predicates. Under the circumstances, it is clear that the jury found Ray Corona guilty of sufficient Travel Act predicate acts to support the substantive RICO and RICO conspiracy charges. Judge Vance dissents from the Court's decision in this regard. He would hold that since the jury returned general verdicts on the RICO charges, it cannot be determined whether it based its verdicts on at least two valid predicate acts. He would thus hold that a new trial is required on the substantive RICO and RICO conspiracy counts. *See United States v. Ruggiero*, 726 F.2d 913, 921–23 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

*Conclusion*

We reverse Rafael Corona's Travel Act conviction (Count VIII) because the evidence was insufficient. We affirm Ray Corona's Travel Act conviction on Count VII. We reverse Ray Corona's Travel Act conviction on Count VI due to insufficient evidence, with Judge Evans dissenting. We affirm his RICO conspiracy (Count I) and substantive RICO (Count II) convictions, with Judge Vance dissenting.

REVERSED AS TO RAFAEL CORONA; AFFIRMED IN PART, and REVERSED IN PART AS TO RAY CORONA.