RAY L. CORONA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Corona v. Commissioner
Docket No. 11391-90
United States Tax Court
T.C. Memo 1992-406; 1992 Tax Ct. Memo LEXIS 426; 64 T.C.M. (CCH) 196; July 16, 1992, Filed *426 Decision will be entered for respondent. During the early 1980s, P owned shares of stock of a State chartered bank, a part of whose deposits were insured by the FDIC. The parties have stipulated that the bank was insolvent in 1984. For several years, including the year at issue (1984), the bank was subject to increasing scrutiny by both the State banking authorities and the FDIC. Those authorities took several regulatory actions against the bank and its officers and directors, requiring the correction of various unsafe or unsound banking practices. In 1986, the State authorities appointed the FDIC as liquidator of the bank, and it was closed. For 1984, P claimed a loss, resulting from the alleged worthlessness of his bank shares. See sec. 165(a), (g), I.R.C.Held, P has failed to meet his burden of proving that, during 1984, his shares had lost all potential value, within the meaning of Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940), and were thus worthless. For Ray L. Corona, pro se. For Respondent, Sergio Garcia-Pages. HALPERN
HALPERN
MEMORANDUM FINDING OF FACT AND OPINION HALPERN, Judge *427 : By notice of deficiency dated March 21, 1990, respondent determined a deficiency in petitioner's Federal income tax for the tax year ended December 31, 1984, in the amount of $ 445,986.34, together with an addition to tax in the amount of $ 111,497. That addition was imposed under section 6661, on account of a substantial understatement of income tax liability. The only issue for decision is whether petitioner's stock in the Sunshine State Bank (SSB) became worthless in 1984. [1]
Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT At the time the Petition in this case was filed, petitioner *428 resided in Miami, Florida. Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties and attached exhibits are incorporated herein by this reference. Sunshine State Bank
SSB was a State Bank, chartered by the State of Florida and doing a banking business in Miami, Florida. At least a part of SSB's deposits was insured by the Federal Deposit Insurance Corporation (FDIC), and SSB was subject to the Federal Deposit Insurance Act as an insured nonmember bank. SSB was closed in May 1986, subsequent to a determination by the Comptroller of the State of Florida and Head of the Department of Banking and Finance (Florida Comptroller) that SSB was insolvent and that the appointment of a liquidator was in the public interest. FDIC was appointed as liquidator of SSB on May 23, 1986. At all times relevant here, petitioner owned a controlling interest in SSB. During 1984, on at least two occasions, petitioner purchased from SSB shares of SSB stock: On February 29, 1984, petitioner purchased 200,000 shares, for $ 2 million; on September 30, 1984, petitioner purchased 62,500 shares, for $ 625,000. In a statement of net worth made as of *429 January 15, 1986, petitioner showed 278,071 shares of SSB stock as an asset, with a cost of $ 3,111,450 and a present market value equal to cost. At least until December 1984, petitioner, Rafael L. Corona, his father, and Ricardo R. Corona, his brother, were all either directors or senior officers of SSB, or both. Regulatory History
During the 5 years leading up to its closure, SSB was subject to increasing scrutiny by both the Florida Department of Banking and Finance (Florida Banking Department) and FDIC. During those years, FDIC conducted six examinations of SSB: as of July 10, 1981, February 19, 1982, February 4, 1983, September 30, 1983, August 20, 1984, and October 1, 1985. At each examination, FDIC prepared a Report of Examination, documenting a continuing decline in SSB's overall financial condition. Some of the findings of these examinations, such as assets subject to adverse classification and SSB's book and adjusted capital and reserves, are summarized in the following chart: SUNSHINE STATE BANK
Adversely Classified Assets [1]
Examination
Date as of
Substandard
Doubtful
Loss
7/10/81
$    558,000
$    96,000
$    46,000
2/19/82
640,000
165,000
173,000
2/4/83
22,560,000
472,000
803,000
9/30/83
26,215,000
1,285,000
4,746,000
8/20/84
36,625,000
3,698,000
7,806,000
10/1/85
26,966,000
12,908,000
18,022,000
*430 Total Assets
Percentage of
Book Capital
Adjusted [1]
Examination
Adversely
Total Assets
and Reserves
Capital and
Date as of
Classified
Classified
(Unadjusted)
Reserves
7/10/81
$    700,000
2/19/82
978,000
1.90%
2/4/83
23,835.000
29.33%
$ 4,567,000
$   3,528,000
9/30/83
32,246,000
31.98%
5,549,000
161,000
8/20/84
48,129,000
46.71%
6,144,000
(3,511,000)
10/1/85
57,896,000
54.53%
1,377,000
(23,327,000)
*431 Highlights of some of SSB's involvement with FDIC and the Florida Banking Department from 1983 to 1986 are as follows: -- FDIC Report of Examination as of February 4, 1983
In its Report of Examination as of February 4, 1983, FDIC concluded that SSB's then current level of capital protection was inadequate. FDIC concluded that an injection of at least $ 3,200,000 in new capital was required. SSB was rated in each of five categories: capital, asset condition, quality of management, earnings (future and potential), and liquidity. Where a rating of "1" represents the best possible condition and where a rating of "5" represents the worst possible condition, SSB was given a rating of 5 in three of five categories and a rating of 4 in two categories. Overall, SSB was given a rating of 5, which rating indicated an extremely high immediate or near term probability of failure, absent urgent financial assistance and decisive corrective measures. -- Consolidated FDIC Action; 1985 FDIC Consolidated Order
Based on its examinations as of February 4, 1983, and September 30, 1983, FDIC initiated various actions against SSB and its officers and directors. On August 3, 1983, November *432 22, 1983, and March 12, 1984, FDIC issued three separate Notices of Charges and of Hearing, charging SSB with engaging in unsafe and unsound practices and committing violations of the law. On March 12, 1984, FDIC issued a Notice of Intention to Remove from Office and to Prohibit from Participation against petitioner, his father, and his brother, alleging unsafe and unsound banking practices, violations of laws, and breaches of fiduciary duties. The actions initiated by those notices were consolidated in April 1984 (Consolidated FDIC Action). Hearings were held before an administrative law judge (ALJ) during the summers of 1984 and 1985. Recommended decisions were issued by the ALJ in November 1984 and July 1985. Following the filing of exceptions and briefs, FDIC's board of directors, in August 1985, decided upon an order, which generally became effective on October 1, 1985 (the 1985 FDIC Consolidated Order). Pursuant to that order, SSB and it directors and officers were ordered to cease and desist from certain unsafe or unsound banking practices and violations of law and to carry out various actions and reforms in SSB's banking practices. [2]
*433 -- FDIC Temporary Order to Cease and Desist, November 28, 1983
At the time that the actions giving rise to the Consolidated FDIC Action were being initiated, FDIC issued a Temporary Order to Cease and Dentist to SSB and its directors and officers,effective on November 28, 1983 (1983 FDIC Temporary Order). FDIC issued that order after determining that the practices and violations at issue in the Consolidated FDIC Action were likely, prior to the completion of such action, to cause insolvency or significant dissipation of SSB's assets or earnings, or to weaken SSB's condition or prejudice the interests of SSB's depositors. The 1983 FDIC Temporary Order required SSB to cease and desist from any such practices or violations. -- Florida Memorandum of Understanding, January 25, 1984
After completion of the FDIC examination as of September 30, 1983, SSB and the Florida Banking Department entered into a Memorandum of Understanding, dated January 25, 1984 (1984 Florida Memorandum). That memorandum states that such examination "reflects severe weaknesses, which if not immediately corrected, would further jeopardize the financial viability of the Bank." The 1984 Florida Memorandum *434 required SSB, among other things, (1) to reduce brokered deposits to 10 percent of total deposits within 45 days and to notify the Florida Banking Department of all brokered deposits in excess of 5 percent of total deposits, (2) to maintain a loan/deposit ratio of 70 percent and reduce total deposits to $ 100 million or less absent a capital/deposit ratio of 6.5 percent, and (3) to increase its capital by $ 3 million within 270 days. In 1984, SSB complied with many, but not all, of the provisions of the 1984 Florida Memorandum. Among other things, by September 30, 1984, petitioner had contributed an additional $ 2,625,000 in capital to SSB, by purchasing additional shares of SSB stock. -- FDIC Order of Correction, March 15, 1984
In turn, FDIC also took action based on the FDIC examination as of September 30, 1983. FDIC found that SSB had been engaging in unsafe or unsound banking practices and was in an unsafe or unsound condition to continue operations as an insured bank. In particular, FDIC found that SSB was operating with inadequate capital and reserves, an excessive volume of poor quality loans, and a management whose policies and practices jeopardized the safety *435 of SSB's deposits and were detrimental to SSB. FDIC issued an order of correction, effective March 15, 1984, providing that, if FDIC were to continue to insure SSB's deposits, SSB had to undertake certain corrective measures (1984 FDIC Order of Correction). That order required SSB (1) to increase capital and reserves by not less than $ 8,200,000, (2) to write-down within 20 days certain assets adversely classified as either loss or doubtful, (3) to provide and retain a chief executive officer and a senior lending officer, who were not current employees of SSB, and (4) to notify FDIC when brokered deposits represented 5 percent or more of total deposits. -- FDIC's Response to the Federal Indictments Against Petitioner and His Father, Raphael Corona
On December 13, 1984, FDIC reviewed recent indictments, charging petitioner and his father with multiple Federal crimes involving dishonesty or breach of trust, including racketeering (RICO) and mail fraud. See generally United States v. Corona, 885 F.2d 766 (11th Cir. 1989). [3] FDIC found that the continued participation by petitioner or his father in SSB's affairs posed a threat to SSB's depositors or threatened *436 to impair public confidence in SSB. Accordingly, petitioner was suspended as chairman of SSB's board of directors, his father was suspended as a director of SSB, and both were prohibited from further participation in SSB's affairs. However, neither petitioner nor his father fully complied with those orders.
-- 1985 FDIC Order to Cease and Desist
Also on December 13, 1984, after reviewing the Federal indictments, FDIC issued to SSB, petitioner, his father, and his brother a Notice of Charges and of Hearing and a Temporary Order to Cease and Desist, alleging unsafe or unsound banking practices. Those FDIC actions resulted in a consent agreement dated March 13, 1985, between FDIC, SSB, and the named individuals. Pursuant to that agreement, *437 FDIC issued an Order to Cease and Desist, prohibiting SSB from assisting petitioner or his father with defense expenses related to the Federal indictments and from extending loans to anybody, the purpose of which was to benefit petitioner or his father, unless such loans were fully secured (1985 FDIC Order to Cease and Desist). -- Florida Consent Order, February 5, 1985
The Florida Banking Department also responded to the Federal indictments of petitioner and his father. The Florida Banking Department's response resulted in a Consent Order that became effective on February 5, 1985, and that superseded the 1984 Florida Memorandum (1985 Florida Consent Order). The Florida Banking Department had carried out an examination of SSB as of May 18, 1984, which, "despite certain improvements, revealed continued weakness, which if not corrected, * * * [would] jeopardize the safety and soundness of the bank." -- FDIC Report of Examination as of August 20, 1984
FDIC's Report of Examination as of August 20, 1984 (1984 FDIC Report), was completed in February 1985. The report concluded that, as of August 20, 1984, SSB was insolvent, in that its liabilities exceeded its adjusted *438 assets, and that at least $ 11,000,000 in new capital was necessary to bring its capital to an acceptable level. Finally, SSB was given a rating of 5 in four of five categories and a rating of 4 in one category. The composite rating was again 5, the worst possible rating. The 1984 FDIC Report commented that the last three examinations disclosed an escalating trend of deterioration in SSB's overall condition and that, during that period, petitioner, his father, and his brother exercised a dominant and controlling influence over SSB's management, policies, and daily operations. The report heavily criticized SSB's directors and the Corona family for failing to remedy the loan problems brought to their attention by FDIC, to implement many of FDIC's recommendations from earlier examinations, and to comply fully with the banking laws. In the report, FDIC noted the suspensions of petitioner and his father from their positions with SSB and emphasized the need for the directors to install a qualified management team. In sum, the 1984 FDIC Report stated that SSB's survival hinged on a massive recapitalization, employment of acceptable management, drastic cost cutting measures, and a restructuring *439 of SSB's assets and liabilities. -- FDIC Order of Correction, September 11, 1985
Based on the 1984 FDIC Report, FDIC again found that SSB had engaged in unsafe or unsound banking practices and was in an unsafe or unsound condition to continue operations as an insured bank, unduly jeopardizing FDIC's insurance risk. FDIC issued an Order of Correction, effective September 11, 1985, providing that, if SSB were to continue as an insured institution, SSB had to take certain corrective measures (1985 FDIC Order of Correction). -- FDIC Report of Examination as of October 1, 1985
By letter dated April 22, 1986, the Atlanta Regional Office of FDIC forwarded to SSB a copy of its Report of Examination as of October 1, 1985 (1985 FDIC Report). In that letter, the Atlanta Regional Office notified SSB that it was recommending to FDIC's Washington, D.C., office that SSB be retained on the formal problem list, that the formal action to terminate SSB's insured status be continued, and that civil money penalties and an enforcement action be pursued based on SSB's noncompliance with various FDIC orders. The 1985 FDIC Report determined again that SSB was insolvent and gave SSB individual *440 ratings of 5 in all five categories for the first time and another overall rating of 5. It concluded that SSB's survival hinged on a massive recapitalization, employment of acceptable management, drastic cost cutting measures, and a restructuring of SSB's assets and liabilities. -- Appointment of Liquidator, May 23, 1986
On May 23, 1986, the Florida Comptroller appointed FDIC as liquidator of SSB, to liquidate SSB's assets and wind up its affairs. The Florida Comptroller based his decision to appoint a liquidator on the 1985 FDIC Report completed in April 1986 and, in particular, on the findings in that report that the value of SSB's adjusted capital and reserves was negative $ 23,327,000 and that SSB had a composite rating of 5, the worst possible rating. Petitioner's 1984 Return
On his 1984 return, as originally filed, petitioner reported a long-term capital gain of $ 4,140,000. By amended return, petitioner reported a short-term capital loss of $ 2,625,000, resulting from the worthlessness of his SSB shares. OPINION Section 165(a) allows a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise. To be allowable *441 as a deduction under section 165(a), a loss must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs. If shares of stock in a corporation become wholly worthless during a taxable year, the loss resulting therefrom may be deducted under section 165(a), as an ordinary loss or as a capital loss, as appropriate. See sec. 165(g); sec. 1.165-5, Income Tax Regs.
As stated previously, the only issue before us is whether petitioner's stock in SSB became worthless in 1984. Whether shares of stock have become worthless, and the taxable year in which such worthlessness has occurred, are questions of fact, and petitioner bears the burden of proof. Rule 142(a); Figgie International, Inc. v. Commissioner, 807 F.2d 59, 62 (6th Cir. 1986), affg. T.C. Memo. 1985-369; Clark v. Welch, 140 F.2d 271 (1st Cir. 1944). To carry that burden, petitioner must show that, in 1984, his SSB stock ceased to have both liquidating value (an excess of assets over liabilities) and potential value (a reasonable expectation that the assets would exceed *442 the liabilities in the future). Austin Co., v. Commissioner, 71 T.C. 955, 969-970 (1976); Steadman v. Commissioner, 50 T.C. 369, 376 (1968), affd. 424 F.2d 1 (6th Cir. 1970); Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940). Since respondent has conceded on brief that SSB was insolvent at 1984 year end, we will take it as a given that, in 1984, SSB lacked liquidating value. The parties disagree as to whether SSB had potential value during 1984. We explained the importance of potential value in Morton v. Commissioner, supra at 1278-1279: The ultimate value of stock, and conversely its worthlessness, will depend not only in its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that *443 the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. We described "identifiable events" as events that "limit or destroy the potential value of stock", "such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it." Id. at 1278; see also Steadman v. Commissioner, supra at 1278. Simply put, petitioner has failed to show an identifiable event in the life of SSB occurring in 1984 that would put an end to the hope and expectation that the value of SSB's assets would exceed its liabilities in the future. Petitioner has shown neither the bankruptcy, cessation from doing business, liquidation of SSB, appointment of a receiver for SSB, nor any other event that clearly limited or destroyed in 1984 the potential value of his SSB shares. Of course, during 1984, SSB was under *444 intense scrutiny by FDIC and the Florida Banking Department. We cannot see, however, how an examination or the completed report of such an examination constitutes an identifiable event. Further, we cannot see how any of the various actions taken during 1984 by those two regulatory agencies constitutes an identifiable event within the meaning of Morton v. Commissioner, supra at 1278. Although the 1984 Florida Memorandum and the 1984 FDIC Order of Correction were issued during 1984, and although SSB was subject during 1984 to the 1983 FDIC Temporary Order, those actions simply required SSB to take various corrective measures, and none of them constituted the respective agency's severest form of regulatory action. While FDIC, in the Consolidated FDIC Action initiated in late 1983 and early 1984, charged SSB with engaging in unsafe and unsound practices and committing violations of law and moved to remove the Coronas from corporate positions, the Consolidated FDIC Action did not in any event result in the issuance of an order until August 1985, when the 1985 FDIC Consolidated Order was issued. Furthermore, the 1984 FDIC Order of Correction, issued upon consideration *445 of the September 1983 examination and effective March 1984, threatened termination of FDIC insurance unless certain corrective measures were taken. While such termination certainly would have been serious, nothing in the record indicates that FDIC made good on its threat in 1984. Finally, the actions taken by FDIC in December 1984 after the Federal indictments were filed against petitioner and his father are not identifiable events that limited or destroyed the potential value of SSB stock. Those actions related to the removal of petitioner and his father as officers and directors of SSB and the prohibition against their future involvement with SSB; if anything, those actions may have had a positive effect on the value of petitioner's SSB shares. In sum, petitioner would have us hear a death knell in the regulatory concern and action taking place in 1984. That we do not hear. Both FDIC and the Florida Banking Department were, in 1984, providing prescriptions for recovery. Neither regulatory body seems to have given up hope for SSB's recovery until completion in April 1986 of FDIC's report of examination as of October 1, 1985. We conclude that there was no identifiable event, *446 Morton v. Commissioner, supra, with regard to SSB in 1984. Compare Thompson v. Commissioner, 115 F.2d 661 (2d Cir. 1940), affg. 40 B.T.A. 1380 (1939); Bartlett v. Commissioner, 114 F.2d 634, 639 (4th Cir. 1940); In re Hoffman, 16 F.Supp. 391, 392 (E.D. Pa. 1936), affd. Yocum v. Rothensies, 87 F.2d 200 (3d Cir. 1936). Nevertheless, as we said in Morton v. Commissioner, supra at 1279 (citing De Loss v. Commissioner, 28 F.2d 803, 804 (2d Cir. 1928)): There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable *447 event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." * * * See also Steadman v. Commissioner, 50 T.C. at 377 (citing Morton v. Commissioner, supra at 1279, and concluding, on the facts there at issue, that, after a given year, there was no reasonable expectation of future profit to the shareholders of the corporation and that a prudent businessman would have ascertained the stock to be worthless in that year). We reject petitioner's implied argument that this case is one of the exceptional cases described in Morton v. Commissioner, supra at 1279, where the liabilities of the corporation are so greatly in excess of its assets that there is no reasonable hope and expectation of future profit through continued operation of the business. While the 1985 FDIC Report (October 1, 1985) found that SSB's capital and reserves had a value of negative $ 23,327,000, the 1984 FDIC Report (August 20, 1984) calculated only a negative $ 3,511,000. That latter figure is relatively small in light of petitioner's *448 own contribution to capital of $ 2,625,000 during 1984. Also, such amounts of capital and reserves were determined after making substantial adjustments to unadjusted "book" capital and reserves, for adversely classified assets. On a book basis, SSB's capital and reserves totaled $ 6,144,000 and $ 1,377,000, both positive values, as of August 20, 1984, and October 1, 1985, respectively. Petitioner has demonstrated neither how severe the capital and reserve problem of SSB had grown by the end of 1984 nor that a prudent businessman would have discounted SSB's capital and reserves as severely as did FDIC, which, as a bank examiner and regulator, may well have been under different pressures to adversely classify assets than a prudent businessman would be in judging the probability of future profits from a continuation of SSB's business. FDIC undoubtedly was aware of the deteriorating capital position of SSB during 1984, yet it took no action during 1984 to terminate deposit insurance coverage. FDIC issued the 1984 FDIC Order of Correction and the 1985 FDIC Order of Correction, which threatened termination of insurance if certain corrective measures were not taken. We take FDIC's failure *449 to terminate deposit insurance during 1984, in the face of a deteriorating capital structure, which it was aware of, as an indication that, during 1984, FDIC had not eliminated the possibility of a recovery. If it had eliminated that possibility, FDIC would not have allowed its exposure to underwriting losses to increase as the capital structure of the bank further deteriorated. Likewise, during 1984, the Florida Banking Department did not act to close SSB, but, by issuing the 1984 Florida Memorandum, it acted only to require SSB to rehabilitate itself. Petitioner has not carried his burden of showing that, during 1984, SSB presented the exceptional case contemplated in Steadman v. Commissioner, 38 B.T.A. at 377. In sum, we hold that petitioner has failed to meet his burden of proving that his SSB stock became worthless in 1984. For the foregoing reasons, Decision will be entered for respondent. Footnotes
1. The parties have so stipulated. We assume that petitioner has conceded any other adjustments, and the addition to tax, which were disputed by him in the petition. Of course, computation of the addition to tax may change if we redetermine the deficiency.↩
1. At each examination of SSB, the FDIC examiners reviewed all of the bank's assets and, where appropriate, adversely classified an asset as: substandard, doubtful, or loss, with a loss classification being the most severe. SSB's assets included loans, securities, real estate, and fixed assets, with loans representing the bulk of the assets. In Sept. 1985, SSB, petitioner, his father Rafael Corona, and his brother, Ricardo Corona, petitioned the U.S. Court of Appeals for the Eleventh Circuit for review of FDIC's decision and order in the FDIC Consolidated Action. On Mar. 13, 1986, in Sunshine State Bank v. FDIC, 783 F.2d 1580 (11th Cir. 1986), the Eleventh Circuit affirmed FDIC's actions.
[2]↩ For regulatory purposes SSB's book capital and reserves were adjusted by subtracting 100% of the book value of assets classified as "loss" and 50% of the book value of assets classified as "doubtful". No adjustment (subtraction) was made for assets classified as "substandard". In some cases, there were other adjustments to book capital and reserves.
3. Petitioner later was convicted of having in 1977 and 1978 assisted a drug dealer in buying a controlling interest in SSB with laundered drug money under dishonest circumstances. See United States v. Corona, 885 F.2d 766, 773-774↩ (11th Cir. 1989).