**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jorge Enrique GONZALEZ, a/k/a George, Maurice Roundy, Michael Timothy Sweeton, Defendants–Appellants.**

**No. 89–7449.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 30, 1991.

Louis Casuso, Miami, Fla., for Jorge E. Gonzalez.

Thomas M. Goggans, Montgomery, Ala., for Maurice Roundy.

Anthony M. Traini, Leppo & Traini, Randolph, Mass., for Michael T. Sweeton.

D. Broward Segrest, Asst. U.S. Atty., Montgomery, Ala., for the U.S.

Before TJOFLAT, Chief Judge, FAY, Circuit Judge, and HOFFMAN *, Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge:

This case is one of at least two appeals to reach this court relating to the prosecution of a drug-importation ring headed by Jerry Allen LeQuire. Appellants Jorge Enrique Gonzalez, Maurice Roundy and Michael Timothy Sweeton appeal from their convictions for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d) (1976). Appellants were named in a 38–page, five-count superseding indictment returned on March 29, 1989. The original indictment in this case was re-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

turned on July 29, 1988.[1] Count I of the superseding indictment contained a RICO conspiracy charge. Count II charged substantive RICO violations. Count I referred by incorporation to Count II for its predicate acts constituting a pattern of racketeering. A jury trial was conducted on March 20 through March 29, 1989 in the Middle District of Alabama, Truman M. Hobbs presiding. Appellants were each convicted on the RICO conspiracy charges of the superseding indictment[2], and each has appealed. The appellants raise a number of challenges including double jeopardy, sufficiency of the evidence, admissibility of evidence and the statute of limitations. We consider the appellants' grounds of appeal and affirm all convictions.

## I.

## THE FACTS: THE LEQUIRE ENTERPRISE

Jerry LeQuire, operating out of Fort Lauderdale, Florida, headed a large operation importing cocaine from Colombia. LeQuire, beginning in 1982, imported cocaine for the Arango organization and the Herrera organization, as well as for his own purposes.

LeQuire arranged for airplanes to fly from Henry Maierhoffer's fixed-base operation at the Fort Lauderdale airport to specific airstrips in Colombia. The planes had been modified to carry additional payloads and sufficient fuel to make nonstop flights between the United States and Colombia. Upon arrival in Colombian airspace, LeQuire's planes would be met by a small plane which would lead them to the airstrip.

LeQuire's planes would spend the night in Colombia before being loaded with duffel bags of cocaine and refueled for the return flight to the United States. The planes would fly at low altitude until they reached the designated airport in Georgia, Alabama, or Tennessee. LeQuire arranged for his ground crews to arrive at the landing site at approximately the same time as the airplanes.

The ground crew would scout the landing area to make sure that the area was safe for the plane to land and unload the cocaine. The ground and flight crews were in radio communication. If the landing site was not safe, the ground crew would divert the airplane to a different site. The ground crew would then drive to the alternate landing site and scout the site before permitting the plane to land.

The planes would usually land after sunset. Upon landing, the duffel bags of cocaine would be pushed onto the runway. The plane would take off and fly to a different airport for refueling before being flown back to the Fort Lauderdale base. The ground crew would put the cocaine into the trunks of their motor vehicles and drive to Fort Lauderdale. While enroute to Fort Lauderdale, the ground crew would contact LeQuire, who would tell them to deliver the cocaine to a specific safe house.

In mid-May 1983, LeQuire told his employees that he was not going to transport any more cocaine for thirty days due to military maneuvers in the Caribbean. William Zeigler, who had been the *de facto* foreman of the ground crew, made plans to go to Las Vegas to watch a fight. LeQuire then decided to go ahead with one of the ill-fated flights which lead to this case. Zeigler was not able to participate in this delivery.

---

1. The superseding indictment was necessary because of the severance granted on behalf of the present appellants. Nine other individuals besides the current appellants were named in the superseding indictment. The only defendants to proceed to trial were these appellants. The remaining defendants either pled guilty prior to trial or remained fugitives.

2. After trial Judge Hobbs granted defendant Roundy's deferred motion to dismiss, for lack of proof of two predicate acts, the substantive RICO charge contained in Count II of the superseding indictment insofar as it applied to him. The jury had returned a verdict of guilty on this charge. No other defendants were indicted of substantive RICO violations, thus all three convictions in this appeal involve RICO conspiracy. Gonzalez, Roundy and Sweeton received sentences of 9 years, 5 years and 40 months respectively.

On May 23, 1983, LeQuire's ground crew was robbed of the cocaine they had just received from Colombia. In April 1983, three men had been able to discover the operations at the Sylvania, Georgia (Plantation Park Airport) landing strip. The three men were planning to rob the operation. On May 23, 1983, a LeQuire plane piloted by Jose Pine brought a load of cocaine to the ground crew at the Sylvania airstrip. The ground crew consisted of Pi, Ward, Abner and the appellant Michael Timothy Sweeton. The ground crew put the cocaine in the trunks of their two cars.

Two cars with blue lights and men in police uniforms stopped the ground crew as they were leaving the airport. One of the men in uniform shot one member of the ground crew as he got out of the first car. The tires of the second car were shot out as it tried to escape. Three members of the ground crew were wounded and Pi escaped into the woods.

Pi died of natural causes before trial. Pi had given the account of the May 23, 1983 events to his brother, Jose Pine. The brother, who was the pilot on that day's flight, testified about the contents of that conversation at trial. A Georgia Bureau of Investigation (GBI) agent testified that, the day after the shooting, he saw Pi come out of the woods not far from the site of the shooting.

Defendant Sweeton was seriously injured during the incident. Sweeton apparently walked from the scene to the edge of a plowed field, then crawled to a tobacco barn. Agent Gillis of the Georgia Bureau of Investigation tracked blood stains and tracks to a place where "there was an imprint in the ground that appeared as someone had lain in that location for a period of time." Agent Gillis found a wallet containing Sweeton's drivers license at that spot.

Abner, another member of the ground crew, had also been shot. Abner walked to a nearby house and asked Hill, the resident, to call the Statesboro, Georgia, Quality Inn for help. A person named Sue responded and came to the house. Abner, Sue and Hill, the resident, went to the shooting site and thought that Ward was dead. Ward and Sweeton were hospitalized and recovered.

When questioned at the hospital by GBI Agent Stone, Ward and defendant Sweeton said that they had met at a bar and that Ward had taken Sweeton to the airport to see Ward's trailer and that they were shot and robbed while leaving. Sweeton also said that he had traveled from Florida to Georgia that day as part of a hitch-hiking trip. Sweeton was visited at the hospital by his uncle and co-defendant, Maurice Roundy.

After the theft of the cocaine a private investigator, Terry Cornell, Sr., was brought from Chicago to give stress tests to members of LeQuire's organization to see if they were responsible for the robbery. Defendant Jorge Enrique Gonzalez picked up Cornell's assistant, DeFranco, at the airport and delivered him to a meeting with LeQuire. Defendant Gonzalez was employed by Herrera in some unknown capacity. Gonzalez was seen at LeQuire's residence with Herrera on three or four occasions. Gonzalez also hired Terry Cornell, Jr. to sweep apartments used by the organization for electronic bugs. Gonzalez was also seen by Terry Cornell, Jr. at a Fort Lauderdale hotel where Cornell dropped off the cocaine from a mid-July 1983 load of which he had been on the ground crew.

On August 1, 1983, Defendant Roundy flew two people from Portland, Maine, to Fort Lauderdale and introduced them to LeQuire. These individuals were Newcomb and Johnson, who would participate as copilot and ground crew member for an importation LeQuire was planning for August 3rd. Testimony also showed that Roundy was seen at Maierhoffer's fixed base or LeQuire's house often, and that he flew numerous flights bringing cocaine into the country.

By August 3, 1983, LeQuire's import business began to unravel. That day's flight had been diverted twice and was forced to land at Dannelly Field in Montgomery, Alabama, due to low fuel. Law enforcement personnel were contacted due

to the suspicious way in which the plane taxied to the airport's refueling area and the duffel bags stacked in the plane. The plane was carrying approximately 700 pounds of cocaine. The police arrested the pilot, Omar Mahdi, and shortly thereafter the entire ground crew was arrested. LeQuire was arrested fifteen days later.

Karla Espinal, LeQuire's former wife, told the government that she paid defendant Gonzalez $300,000 to try and break LeQuire out of jail. She testified that she spoke to Gonzalez on numerous occasions about escape attempts and gave him information about jails in which LeQuire was being held in. Espinal stated that Gonzalez returned $210,000 to Espinal and deducted $90,000 for expenses.

The superseding indictment charged defendants Sweeton and Gonzalez with one count of RICO conspiracy and both were convicted. The superseding indictment charged defendant Roundy with one count of RICO Conspiracy and one count of substantive RICO. Roundy was convicted of both counts. The District Court granted Roundy's post trial motion for judgment of acquittal as to the substantive RICO count.

## II.

## DOUBLE JEOPARDY

▆▆▆ Appellant Roundy, at oral argument and by supplemental briefing, argues that his indictment and conviction in this case for the RICO conspiracy offense must be set aside under the recent double jeopardy analysis of the Supreme Court in *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). In *Grady* the Supreme Court stated that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defen-

dant has already been prosecuted." *Id.* at 2093, 109 L.Ed.2d 548.

The basis for Roundy's double jeopardy claim is a July 23, 1987 conviction for various drug offenses including possession, importation and conspiracy.[3]

In that trial the government's evidence showed that Roundy's role was that of transporting David Newcomb and Michael Johnson from Portland, Maine to Fort Lauderdale, Florida, on August 1, 1983 and introducing them to Jerry LeQuire who was planning the August 3, 1983 cocaine importation into Montgomery, Alabama. Roundy argues that the inclusion of this incident as a predicate act in the indictment, as well as the government's introduction of evidence of these episodes in this prosecution, constitute a violation of his double jeopardy rights as defined in *Grady*.

Before analyzing Roundy's double jeopardy arguments based on *Grady*, it is important to note that his challenge is solely based on any change in the law of double jeopardy as a result of *Grady*. It is useful to examine prior, and still controlling, case law on this point. The Supreme Court's opinion in *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), which upheld this Court's ruling in *United States v. Garrett*, 727 F.2d 1003 (11th Cir.1984), calls for a two-step analysis to determine whether successive prosecutions run afoul of double jeopardy constraints. The first step is to determine whether Congress intended that each violation be a separate offense. If such was not Congress' intent, there is no statutory grounds for two prosecutions and the double jeopardy analysis is complete. *Garrett*, 471 U.S. at 778, 105 S.Ct. at 2411, 85 L.Ed.2d 764. However if Congress intended there to be separate offenses, and hence separate prosecutions, the second step is to determine whether the second prosecuted offense is considered the "same offense" as defined within the meaning of the Dou-

---

3. Roundy was convicted of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846; possession with intent

to distribute cocaine in violation of 21 U.S.C. § 841(a)(1); conspiracy to import cocaine in

ble Jeopardy Clause.[4] *Id.* at 785, 105 S.Ct. at 2415, 85 L.Ed.2d 764.

In the instant case the relevant question is whether; one, Congress intended separate prosecutions for RICO and its predicate offenses, and; two, whether successive prosecutions of this type are violative of constitutional double jeopardy. This question has already been addressed in this Circuit.

*United States v. Boldin,* 772 F.2d 719 (11th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986) applied the first part of the *Garrett* test to RICO and its predicate offenses. *Boldin* used a three-prong analysis from *Albernaz v. United States,* 450 U.S. 333, 336–42, 101 S.Ct. 1137, 1149–44, 67 L.Ed.2d 275 (1981), to determine Congress' intent with regard to multiple prosecutions for RICO and its predicate acts. *Boldin* looked at (1) the statutory language, (2) whether the two offenses are sufficiently distinguishable from one another, and (3) the legislative history. *Boldin,* 772 F.2d at 729. Noting that RICO and its predicates are in distinct chapters of the United States Code, that RICO and its predicates are sufficiently distinguishable,[5] and that the legislative history does not indicate any contrary Congressional intent, this Court in *Boldin* concluded that Congress authorized multiple

prosecutions for RICO and its predicate drug offenses. *Id.*[6]

This Court, having already concluded in *Boldin* that Congress intended RICO and its predicate crimes to be separate offenses and allow successive prosecutions, must now turn to the second level of the *Garrett* double jeopardy inquiry: whether the predicate offense is the "same offense" as the RICO charge within the meaning of the Double Jeopardy Clause. Roundy's argument necessitates that we examine this question in light of the Supreme Court's decision in *Grady,* 110 S.Ct. 2084, 109 L.Ed.2d 548.

*Grady* involved an attempted prosecution, by the State of New York, of homicide and assault charges against a defendant who had been at fault in a fatal car accident. The defendant had earlier pled guilty to two misdemeanor charges, driving while intoxicated and failure to keep right of the median. The reprosecution was sought because, at the time of the misdemeanor pleas and the sentencing thereunder, the court had not been informed of the fatality. *Id.* 110 S.Ct. at 2088, 109 L.Ed.2d 548.

The Supreme Court in *Grady* held that the Double Jeopardy Clause barred the subsequent manslaughter and assault charges. Noting that the State of New

---

violation of 21 U.S.C. § 963; and importation of cocaine in violation of 21 U.S.C. § 952(a).

**4.** The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

**5.** *Boldin* used the well-known test in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The *Blockburger* analysis holds that two offenses, rather than one, are said to exist when "each [offense] requires proof of an additional fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. 306 (1936). *Boldin* found that RICO requires proof of elements such as "enterprise" and a "pattern of racketeering activity" which are not part of the predicate drug offenses. *Boldin,* 772 F.2d at 727. Hence *Boldin* noted that, under *Blockburger,* RICO and its predicate drug offenses are sufficiently distinguishable as to infer that Congress intended to authorize multiple punishments. *Id.* at 729. Once the

primary tool for Double Jeopardy determinations, the *Blockburger* test is apparently now used, in large part, as a "canon of statutory construction" to determine Congress's intentions regarding multiple punishments for two statutory violations. *Garrett,* 471 U.S. at 779, 105 S.Ct. at 2411, 85 L.Ed.2d 764. *See also Grady* 110 S.Ct. at 2092, 109 L.Ed.2d 548. ("The *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense.") *citing Brown v. Ohio,* 432 U.S. 161, 166–167, n. 6, 97 S.Ct. 2221, 2226, n. 6, 53 L.Ed.2d 187 (1977).

**6.** Other Circuits have also concluded that Congress' intent was to allow successive prosecutions. *See, e.g., United States v. Persico,* 774 F.2d 30 (2d Cir.1985); *United States v. Grayson,* 795 F.2d 278 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987); *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1987); *United States v. Licavoli,* 725 F.2d 1040, (6th Cir.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984).

York would rely upon the defendant's operation of a motor vehicle while intoxicated and his failure to keep right of the median as the reckless or negligent acts in the manslaughter and assault prosecutions, the Court announced the principle that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* 110 S.Ct. at 2093, 109 L.Ed.2d 548.

Roundy's argument is that the double jeopardy formulation in *Grady* should operate to overturn his RICO conviction because he has already been convicted in another prosecution for the crimes now used as RICO predicates. Specifically, Roundy maintains that, in both prosecutions, the government has caused to be indicted and presented evidence regarding the same activities involving him in the Montgomery importation, *i.e.*, transporting Newcomb and Johnson from Maine to Florida, and introducing them to LeQuire.

Although *Grady* is yet less than four months old, the Third Circuit has already, on two occasions, had the opportunity to rule, and we feel correctly, on the very issue Roundy presents. In *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990) and *United States v. Esposito*, 912 F.2d 60 (3d Cir.1990), different panels of the Third Circuit declined to interpret *Grady's* double jeopardy language to bar successive prosecutions involving RICO and its predicate offenses. The two cases, while using somewhat different approaches to reach the same result, both rely upon *Garrett v. United States*, which is, in fact, the key to the inquiry.

In *Garrett* the Supreme Court, in a situation more analogous to the instant challenge than *Grady*, held that a prior conviction on a predicate drug offense did not operate as a double jeopardy bar to a later prosecution under 21 U.S.C. § 848 for engaging in continuous criminal conduct (CCE). *Garrett*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). The CCE statute is very similar to RICO in its requirements, structure and application.[7] An important point in the *Garrett* holding was distinguishing the double jeopardy treatment of simple, single conduct crimes such as auto theft and on-going enterprise criminality such as the CCE violation. The *Garrett* Court saw a great difference between the relationship of a CCE charge to its predicates and that of a lesser included misdemeanor within a felony. *Id.* at 787–89, 105 S.Ct. at 2416, 85 L.Ed.2d 764.[8]

Given the similarities between CCE and RICO, and between the facts of the drug-related prosecutions of the *Garrett* defendant and Roundy, we conclude that *Garrett* remains the proper precedent for double jeopardy analysis in this case. *Garrett* was not overruled by *Grady* and, in fact, was cited in *Grady*. 110 S.Ct. at 2091, 109 L.Ed.2d 548. *Grady's* double jeopardy formulation barring successive prosecutions involving the same "conduct" is, by its facts and the facts of the cases it relies upon, limited to single act crimes. The

---

7. The CCE statute, like RICO, relies on a list of predicate offenses, and a violation of the statute requires a series of these predicate violations undertaken in the context of a criminal enterprise. Both "series" and "enterprise" are defined in the statute. *See* 21 U.S.C. § 848(b)(1)—(b)(2)(A). Prosecutions for CCE and RICO are often brought together. *See e.g., Boldin*, 772 F.2d 719 (11th Cir.1985); *United States v. Bascaro*, 742 F.2d 1335 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *United States v. Grayson*, 795 F.2d 278 (3rd Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987).

8. The Court in *Garrett* clearly distinguished as inapposite to the CCE predicate crime analysis an earlier double jeopardy precedent, *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1985), which involved simple joyriding and auto theft prosecutions. *Brown* was a case heavily relied upon in the *Grady* opinion. The other cases upon which *Grady's* holding is based are similarly distinguishable as involving single course of conduct felonies. *See Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) (Barring successive involuntary manslaughter and traffic prosecutions following a car accident); *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (Barring felony murder and robbery with a firearm prosecution stemming from the same grocery store robbery).

Supreme Court's holding in *Garrett* clearly allows for subsequent prosecutions for complex crimes such as the RICO violation Roundy is charged with, notwithstanding an earlier conviction on a predicate charge.[9]

Additionally we note that *Grady* purports to apply a "same conduct" test for double jeopardy purposes. In this regard the *Grady* Court was careful not to use a "same evidence" or a "same transaction" test, and specifically distanced itself from these formulations. *Grady*, 110 S.Ct. at 2093 n. 12, 2094 n. 15. In an important sense, the government is not proving the same "conduct" of Roundy in the two prosecutions. In the earlier trial on narcotics charges, the government was proving Roundy's conduct in assisting the importation and distribution of the drugs. His transportation of coconspirator was evidence of this assistance. In the instant RICO conspiracy case the sole conduct the prosecution is necessarily[10] proving is Roundy's agreement to the RICO conspiracy. His transportation of the coconspirator is again merely evidence of this agreement. Thus in the first prosecution the *conduct* proven is Roundy's role in the substantive crime, *i.e.* what he did. In this prosecution the *conduct* proven is Roundy's agreement, *i.e.* his voluntary relationship to other coconspirator with the aim of violating RICO. These are not the "same conduct." In one the "conduct" is the criminal activity of the importation and distribution of contraband substances; in the other the "conduct" is the criminal activity of being part of an enterprise which operates through the violation of enumerated predicate laws. The mere fact that they are part of the same "transaction" or can be proven by the same "evidence" is not

sufficient to bar successive prosecutions under the language in *Grady*.[11]

We note that this holding may differ somewhat from the view intimated by a recent Second Circuit case, *United States v. Calderone*, 917 F.2d 717 (2nd Cir.1990). There the Second Circuit held that new Double Jeopardy test in *Grady* operated to bar the prosecution of two defendants for a limited narcotics conspiracy after an earlier acquittal from an action alleging a larger conspiracy. *Calderone* involved a government indictment which alleged a limited narcotics conspiracy involving heroin; an earlier prosecution from which the *Calderone* defendants had been dismissed had alleged a larger conspiracy involving many drugs and over a longer period of time.

The Second Circuit barred the subsequent prosecution holding that the second indictment charged the "same conduct" as the first indictment and only varied in its description of the extent of the conspiracy. In applying *Grady* to a conspiracy case over the protestation of the government, the *Calderone* panel stressed the general terms and broad applicability of *Grady's* Double Jeopardy language. Further the Circuit stated that in most conspiracy cases the "agreement" and "conduct" are "all but synonymous" and thus merely changing the indictment's description of the conspiracy, but basing it upon the same actions of the defendants, would violate *Grady's* prohibition of successive prosecutions for the same conduct. (917 F.2d 717).[12]

*Calderone* though, while it does make clear the extension of *Grady* from single occurrence crimes to conspiracies, does not on its facts involve a RICO conspiracy. RICO conspiracies, by operation of the statute, require proof of elements, or "conduct," beyond the substantive crimes them-

---

**9.** This reasoning is similar to that of the Third Circuit in *Pungitore*, 910 F.2d at 1109–1111.

**10.** In this Circuit a defendant's agreement to the commission of two predicate acts is sufficient for RICO conspiracy. The agreement need not be that he personally commit two predicate crimes. *United States v. Carter*, 721 F.2d 1514 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). *See* discussion in "Pattern of Racketeering" *infra*.

**11.** This conclusion follows similar reasoning to that used by the Third Circuit in *Esposito*, 912 F.2d 60.

**12.** In this respect we note that the Second Circuit would appear to disagree with part of our holding above, and that of the Third Circuit in *Esposito*, that the conspiratorial agreement and any actions in furtherance of it, are in fact distinguishable conduct.

selves. General federal conspiracies do not require such showings of the "enterprise" or "pattern of racketeering." The presence of these distinctions lead this court to distinguish the dicta underlying *Calderone's* application of *Grady* to successive conspiracy indictments and to follow the law of *Pungitore* and *Esposito* in specifically declining to apply *Grady* to multiple prosecutions for RICO and its predicate offenses.[13]

### III.

### THE REQUIREMENT OF A PATTERN OF RACKETEERING ACTIVITY

All appellants make arguments challenging the legal sufficiency of the evidence underlying their convictions. In each case the crux of their contentions is that the government has failed in its proof of the "pattern of racketeering" required under the terms of RICO. Although their claims to this end are phrased in various forms, they can be categorized into two types. Gonzalez, Roundy and Sweeton each argue that the government's evidence at trial fails to show their participation in the enterprise's affairs through two predicate acts constituting a pattern of racketeering

activity. Roundy and Sweeton further contend that in their cases the government has charged, as two acts or two statutory violations, conduct by them which in reality constituted only one episode. Thus, they contend, their convictions fail to meet the pattern requirement of two predicate crimes as the charges are actually one by operation of the merger or other related doctrines. We deal with two categories of challenges separately.

### A. *Sufficiency of the Evidence*

At the outset we summarize the elements of a RICO conspiracy.[14] A RICO conspiracy requires proof of an agreement to violate a substantive RICO provision. Here the substantive provision charged was participation in the affairs of an enterprise through a pattern of racketeering activity.[15] For our purposes the important concept here is the "pattern," which in turn requires two predicate acts.[16] This Court has in many respects been in the forefront in the judicial interpretation of these RICO terms, and particularly the RICO conspiracy offense.

In the seminal case, *United States v. Elliott*, 571 F.2d 880, 900–902 (5th Cir. 1978), our predecessor circuit explained the

---

**13.** It must be acknowledged though, that in a case cited by the concurrence in *Calderone,* the Second Circuit has applied *Grady* to bar prosecution for a charge after prior acquittal in a RICO case in which the same charge was indicted as a predicate act. *United States v. Russo,* 906 F.2d 77 (2nd Cir.1990). This case would appear to indicate the Second Circuit's *Grady* view is applicable to facts involving successive prosecutions for RICO and its predicate acts. *Russo* however was a *per curiam* opinion affirming a dismissal on double jeopardy grounds in which the government did not contest the application of *Grady.* In the instant case the government had disputed on both legal and factual grounds *Grady's* applicability to RICO prosecutions.

**14.** 18 U.S.C. § 1962(d) provides that:
It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**15.** 18 U.S.C. § 1962(c):
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partic-

ipate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**16.** The pattern, and other relevant, definitions are found in 18 U.S.C. § 1961 under the sections:
(1) "racketeering activity" means ... (D) any offense involving ... the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or otherwise dangerous drugs, punishable under any law of the United States; ...
(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity.

then new concept of RICO conspiracy as "enterprise conspiracy," and distinguished it from the traditional "wheel" and "chain" theories. The object of the RICO "enterprise conspiracy" was simply to participate in the affairs of the enterprise in the requisite manner. That the many defendants and predicate crimes were different, or even unrelated, was now irrelevant, so long as it could be reasonably inferred that each crime was intended to further the enterprise. *Id.* at 902.

In *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), an important point was made. *Phillips* held that under a RICO conspiracy "no actual acts of racketeering need occur; there need only exist a conspiracy to perform the necessary acts...." *Id.* at 1038.

■ One of the most influential cases in RICO conspiracy law, and the keystone to analysis in this case was *United States v. Carter*, 721 F.2d 1514 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). The *Carter* court, with an analysis and conclusion that has been widely followed in a number of circuits,[17] found that "it is not necessary that the defendant agree to personally commit two predicate acts for the required pattern of racketeering activity." This rule was applicable when "a defendant agreed to participate in the conduct of an enterprise's affairs with the object of violating a substantive RICO provision." *Id.* at 1531. In contrast though, if the defendant agreed to participate in a "single objective" conspiracy, the pattern requirement is met "[o]nly by demonstrating that the defendant agreed to personally commit two or more predicate acts." *Id.*

Finally *United States v. Valera*, 845 F.2d 923 (11th Cir.1988), *cert. denied*, 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989), offers guidance into how to determine that a defendant had agreed to participate in the affairs of the enterprise. The key is "agreement on an overall objective,"

which can be proved by "circumstantial evidence showing that 'each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity'." *Id.* at 929, *citing United States v. Manzella*, 782 F.2d 533, 585 (5th Cir.), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

With this overview of RICO conspiracy in this Circuit, we turn to each of the appellants' sufficiency arguments regarding the "pattern" requirement.

### 1. Gonzalez

■ Gonzalez argues that his conviction should be overturned because the pattern of racketeering activity has not been proved in his case. Gonzalez makes two claims with regard to the proof against him. First he contends that the evidence shows multiple conspiracies and that he was associated with the Herrera organization, not the LeQuire enterprise. This is allegedly shown by his role in investigating the theft of the Sylvania cocaine to be sure the LeQuire organization was not itself involved. Alternatively, he claims that the evidence proved he was involved in a "single object conspiracy," concerning only the Sylvania importation and thus his personal participation in two racketeering acts must be shown. These arguments fail to consider important points made in the RICO conspiracy cases summarized above.

The notion of "enterprise conspiracy" described in *Elliott* has made much of the old distinction between "single conspiracy" and "multiple conspiracy" irrelevant to RICO conspiracy charges. 571 F.2d at 900. Agreement to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity brings a defendant within the conspiracy regardless of the unrelatedness of the acts of other members of the conspiracy. Gonzalez's claim that he was technically a member of the Herrera organization rather than LeQuire's

---

**17.** *See United States v. Neapolitan*, 791 F.2d 489, 496 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986) (Following *Car-* ter and collecting cases in other circuits doing same).

enterprise fails to the extent that it relies upon the multiple conspiracy defense.

Further, Gonzalez's role in these events, even if categorized as Herrera's man, brings him squarely within LeQuire's enterprise. The Herrera organization was described as a regular customer of LeQuire's importation services, and evidence was introduced that the lost May 23 importation into Sylvania and a mid-July importation into Alabama were shipments designated for Herrera and/or Gonzalez. This organization, even as a customer, clearly participated in LeQuire's enterprise under this court's holding in *Valera*, 845 F.2d at 929. In *Valera*, we affirmed a defendant's conviction on almost similar facts, *i.e.*, an individual utilizing the services of a drug importation ring, stating that "mere 'customers' can indeed engage in a pattern of racketeering activity in furtherance of the affairs of the enterprise." *Id.* at 929 *citing United States v. Manzella*, 782 F.2d at 538 (Ruling a "customer" was participating in the affairs of the enterprise on similar facts). *See also United States v. Bascaro*, 742 F.2d 1335 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985) ("Best buyers'" close working relationship with drug ring brought them within RICO enterprise).[18]

With these contentions of Gonzalez removed, the evidence presented to the jury was clearly sufficient to show his agreement on the overall objective of the LeQuire enterprise. Gonzalez is seen investigating the "ripoff" of the Sylvania May 23rd load; at the Holiday Inn during delivery of a mid-July load; doing debugging work for LeQuire; often at LeQuire's house over the course of the period in the indictment, and involved in escape preparations for LeQuire. Of these incidents, both the May 23rd importation and the mid-July importation are listed as predicate events.[19] This is evidence of more than an agreement to a "single objective" conspiracy and Gonzalez is hence not entitled to the *Carter* exception calling for proof of agreement to personally commit two predicate crimes.

## 2. *Roundy*

Roundy's contentions are similar to those of Gonzalez. Appellant Roundy argues that the government proved at trial only his involvement with the May 23rd load into Sylvania, Georgia. Roundy maintains that the government's evidence at trial proved only his transportation of Newcomb and Johnson from Maine to Florida on August 1, and his introduction of them to Jerry LeQuire. Roundy thus argues that he has only been shown to have agreed to one predicate act, the August 3rd importation, and that therefore the requisite pattern is missing. As had Gonzalez, Roundy also makes the argument that this shows only an agreement to a "single objective" conspiracy, in this case, that of the August 3rd importation into Montgomery. Roundy alleges that his agreement to only a "single objective" conspiracy entitles him to the benefit of the *Carter* exception, and the government must therefore prove agreement to personally commit two predicate acts. As in Gonzalez's case above, Roundy's points must also fail.

The evidence concerning Roundy overwhelmingly indicates his agreement to participate in the affairs of the LeQuire enterprise through the requisite pattern of racketeering. Testimony given at trial proves the extent of Roundy's role in the organization. Roundy "checked out" Omar Mahdi as a pilot on behalf of LeQuire; he flew numerous smuggling flights to Colombia;

---

**18.** Evidence was also introduced which belies Gonzalez's claim that he was only a customer of the LeQuire enterprise. Testimony was heard as to Gonzalez's discussions with Karla LeQuire regarding escape attempts for Jerry LeQuire; his electronic bug "sweeping" operations, with Terry Cornell, Sr., on behalf of Jerry LeQuire; and the Herrera organization's role in acquiring the cocaine in Columbia for loading onto LeQuire's planes. All these activities indicate participation in the LeQuire enterprise beyond that of a simple "customer."

**19.** At a post-trial charge hearing the government deleted, as not proven, overt act 61 and some names of codefendants in overt act 60. Both these alleged overt acts related to Gonzalez's receipt of the cocaine from the mid-July importation. However the importation itself was not deleted and remained in the indictment as a predicate act.

he was seen constantly at both LeQuire's Fort Lauderdale home, and Maierhoffer's fixed base operation; he recruited Newcomb in Maine for LeQuire's enterprise (and, by reasonable inference, also recruited Sweeton, his nephew, and Johnson, a fellow pilot) and he transported Newcomb and Johnson to Florida and introduced them to LeQuire just prior to the August 3rd importation. A reccurring phrase in the testimony of the prosecution witnesses is that Roundy "worked for" LeQuire at Maierhoffer's.[20] This degree of involvement was clearly sufficient for the jury to infer Roundy's agreement to the numerous activities of the enterprise. His transporting of Newcomb and Johnson from Maine to Florida, his introduction of them to LeQuire and Lee Curry just prior to the August 3rd flight into Montgomery provide proof of his agreement to at least three predicate crimes: the August 3rd importation violation; his own August 1st Travel Act violation, and Curry's August 1st Travel Act violation in connection with the same importation.

### 3. Sweeton

Sweeton's case presents more difficulty than does Gonzalez's or Roundy's. Sweeton also argues that RICO's pattern element has not been proven by the government. He alleges that the prosecution has linked him, by means of Sweeton's wallet being found at the scene of the Sylvania "ripoff" and other testimony concerning the shooting, to only that incident. Sweeton contends that no other evidence has been offered sufficient to show his involvement or agreement to other acts, particularly predicate crimes, committed by the LeQuire group. Sweeton presents his agreement, if any, as one to join a "single objective" conspiracy and thus within the Carter exception. Sweeton further challenges the government's level of proof regarding the second of the predicate acts he was specifically charged with; that of travelling from Florida to Georgia in connection with the Sylvania importation. Sweeton argues that the only proof put in

evidence regarding his travel, a government agent's testimony that four people got off a Lear Jet rented by LeQuire which flew from Florida to Georgia on the day of the Sylvania unloading, is insufficient to support a Travel Act violation.

 We agree with Sweeton's characterization that he was involved in a "single objective" conspiracy as defined in Carter. If the Carter language and holding is to mean anything, it must apply in a case of this sort. It may be in fact true that Sweeton knew of, and agreed to, a conspiracy with an overall objective of violating RICO, i.e., the LeQuire enterprise's entire drug smuggling activities. However, it simply cannot be said that the government has proven such a wide agreement as this. The government's evidence shows only a more limited agreement on Sweeton's part. Its evidence, that of Sweeton's wallet at the site of the shooting, his story to the GBI agent regarding the shooting, while in the hospital, and the testimony of other conspirators that they had heard of Sweeton being shot, is accurately characterized by Sweeton's brief: "He is not heard of prior to his appearance in Georgia on May 23, 1983 and, once he is shot and almost killed on May 23, Sweeton is neither seen nor heard about again." (Sweeton Brief at 48). Equally important as what the government did prove through its witnesses, is what it was unable to prove. In response to the prosecutor's own questions, no witness could remember seeing Sweeton, or hearing of his name, prior to the news that something had gone wrong at Sylvania. In contrast to the other defendants, he is not seen, or known of, at or around LeQuire's home or Maierhoffer's fixed base operation. A defendant must be convicted on the basis of his own proven conduct, association is not enough. RICO does not punish "mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status." Elliott, 571 F.2d at 903. The government has simply not presented sufficient evidence concerning Sweeton's

---

**20.** Equally prevelant is testimony of the high regard with which people viewed Roundy's flying skills. Without fail he is described as an "excellent pilot" by all witnesses.

*agreement* to the *overall* conspiracy. It is not enough, as the government seeks to do, to argue that LeQuire closely ran his own operations and that, thus anyone involved in one importation would hear of, know of, and hence have agreed to the enterprise's other activities.[21] In Sweeton's case, evidence to support this sort of theory is simply lacking.

 Given that the government has not proven an agreement to join a conspiracy with an overall RICO objective, we must analyze Sweeton's case under the "single objective" conspiracy rule of *Carter:* proof of agreement to personally commit two predicate acts is needed. Because we find that the government has satisfactorily met this standard by proving Sweeton's personal participation in two predicate crimes, we nevertheless find that Sweeton's conviction is supported by sufficient evidence to meet the pattern requirement.[22] As noted above, Sweeton has conceded that the evidence is adequate to show his agreement to one predicate offense: the May 23rd importation at Sylvania. The other predicate act charged to Sweeton is his travel from Fort Lauderdale, Florida, to Savannah, Georgia, on May 23rd to participate in the Sylvania importation. Sweeton argues that the government's proof of this act is insufficient to prove his commission of the predicate act of traveling. The government relies upon the testimony of DEA Agent Parks as to the fact that six individuals got on a Lear jet rented by LeQuire in Fort Lauderdale the day of May 23rd and four got off in Savannah, Georgia. We find, however, that the whole of the evidence will support charging Sweeton with a Travel Act violation under 18 U.S.C. § 1952.

In weighing the evidence, we begin by remarking that by appellant Sweeton's own admission he traveled in interstate commerce prior to the Sylvania load. Sweeton's story in the hospital to GBI Agent Stone was that he had come from Fort Lauderdale the day before. The jury could properly conclude that Sweeton was telling the truth to Agent Stone when he said he traveled from Florida to Georgia, even if it did not believe the rest of his story as to why he was at the Plantation Park Airport. Even assuming, arguendo, that Sweeton may have had other, not unlawful, reasons for his travel, for § 1952 the evidence need only show that the unlawful purpose was one of the purposes of travel, not necessarily the sole or dominant purpose. *United States v. Schultz,* 855 F.2d 1217 (6th Cir. 1988). Furthermore, Agent Park's testimony regarding the Lear jet flight and its passengers is useful to prove travel, despite that fact that the exact identities of the passengers is not known. Evidence in quality similar to this was sufficient for a Travel Act conviction in *United States v. Puntillo,* 440 F.2d 540 (7th Cir.1971), where the fact that defendant was seen in Chicago driving an automobile with Wisconsin license plates and that he lived in Wisconsin was enough to infer travel in or about the time of the indictment. *Id. See also United States v. Peacock,* 761 F.2d 1313 (9th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (Travel properly inferred where facts showed barrels containing contraband chemical were found in Nevada, plant producing this chemical did business only in California,

---

**21.** Further, the government's indictment poses problems even assuming the evidence showed Sweeton agreed to the overall enterprise conspiracy. Excluding the two acts relating to the May 23rd load into Sylvania, the majority of the predicate acts charged to the enterprise occured prior to the time Sweeton can be shown to have joined. It is difficult to see how he thus "agreed" in any sense to these occurrences. Of those predicate acts remaining, which occurred after May 23rd, most were related to other defendants who pled or otherwise were not tried and hence were minimally proven, if at all, during trial.

**22.** The appellant might be heard to argue that the jury was not given an instruction on personal participation. It appears that all defense counsel did object at trial to the given jury instruction which did not call for finding an agreement to personally committing two predicate acts. This point was not, however, raised on appeal before this court, either on brief or at oral argument. We find then that the lack of a jury instruction requiring personal participation in two racketeering acts in the case of single objective conspiracies is not before this court on appeal.

and a truck bearing imprints of barrels could be traced to defendant.).

The evidence is clear in this case that Sweeton was a member of the load crew and that a Lear jet was apparently used to transport some or all of the load crew members from Florida to Georgia. In total, and particularly in light of Sweeton's own admission of travel, there is sufficient evidence to show his personal participation in two predicate acts necessary to fulfill the pattern requirement.

### B. *Merger and Related Claims*

Appellants Roundy and Sweeton also argue that the evidence fails to meet the pattern requirement because the acts charged or proven are closely related in circumstance or at law, and merge so as to constitute one act. Appellants use various, but similar, claims that the predicates underlying their convictions, because they deal with one criminal transaction, are insufficient to constitute a pattern. Roundy argues that the evidence supporting his conviction shows only his acts of transporting Newcomb and Johnson and introducing them to LeQuire in connection with the May 23rd importation. Because of the structure of the Travel Act, the gravamen of which requires one overt act in furtherance of illegal activity subsequent to the travel, Roundy claims his act of introducing Newcomb and Johnson to LeQuire is doing "double duty" in supporting both importation and Travel Act predicates charged to him. Roundy contends that because these two predicates each rest on the introduction to LeQuire for their completion, they merge and constitute only one predicate. Sweeton similarly claims that both his importation and Travel Act predicate crimes rest on his presence at the airport (this being the overt act necessary under the Travel Act), and that these two must merge. Sweeton further contends that his conduct, at least as proven, occurred in close temporal proximity and thus fails the pattern requirement or alternatively, is in reality one act which the government has split into two statutory violations in order to satisfy the pattern requirement.

Roundy's claim that his conviction is due to be overturned because his act of introducing Newcomb and Johnson to LeQuire is doing "double duty," and that therefore the two statutory violations which it supports merge, must fail. Appellant Roundy is correct in alleging that the Travel Act violation is not complete without performing some act in furtherance of illegal activity upon arrival. From the Senate Report on the Travel Act it is clear that "to come within the provisions of the bill some activity in furtherance of a racketeering enterprise, subsequent to performance of the travel, must take place ... accordingly the gravamen of the offense will be travel and a further overt act to aid the enterprise." S.Rep. No. 644, 87th Cong., 1st Sess. 2 (1961), cited in *United States v. Jones*, 642 F.2d 909, 912, n. 4 (5th Cir.1981).

This Circuit has decided this point against the appellant. In *United States v. Pepe*, 747 F.2d 632, 662–663 (1984), this court upheld a defendant's RICO conviction based on Travel Act and loan sharking predicates. We there dismissed the defendant's contention that his travel in interstate commerce and subsequent extortion merged and only supported one offense. Similarly in *United States v. Russo*, 796 F.2d 1443, 1459 (11th Cir.1986), we affirmed two RICO convictions where a single drug importation venture was alleged as a predicate importation act and was also alleged separately, as a violation of the Travel Act. In the case relied upon by appellant, *Phillips*, 664 F.2d at 1038–39, it is true that we held that defendant Echezarreta's alleged predicates of possession with intent to distribute, and actual distribution were merged into only one act. However, the *Phillips* defendant's indictment alleged these as two violations of the *same statutory provision*, 21 U.S.C. § 841(a). Further, on the very next page the *Phillips* court refused to apply this merger analysis to a different defendant, Fisher, whose RICO conviction was based on Travel Act, and importation predicates. *Id.* at 1039. Roundy's situation is the same as Fisher in *Phillips* above; he was indicted of violations of two *different* statutes,

not two violations of the *same* statute. Roundy's predicates do not merge and are sufficient to constitute a pattern.

The standard which has been applied in this Circuit is whether each act constitutes "a separate violation of the [state or federal] statute" governing the conduct in question.... If distinct statutory violations are found, the predicate acts will be considered to be distinct *irrespective of the circumstances* under which they arose.

*Bank of America v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir.1986) (emphasis added), *citing United States v. Watchmaker*, 761 F.2d 1459, 1475 (11th Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).[23]

■ Sweeton's arguments as to the merger of his Travel Act predicate and his possession predicate because they both rely on his presence at the Sylvania airport on May 23, fail for the same reasons discussed above concerning Roundy. The Travel Act violation and the possession charge are both valid predicate acts, notwithstanding the fact that the overt act of the Travel Act offense is the basis for the possession charge. Sweeton's other contention along this line is that because his travel and importation predicate crimes are in such close temporal proximity they fail to meet RICO's pattern requirement. Sweeton is correct that a "pattern of racketeering activity" requires proof of something beyond the two predicate acts themselves. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, n. 14, 105 S.Ct. 3275, 3285, n. 14, 87 L.Ed.2d 346 (1985). The Supreme Court has recently announced the extra element as one of "continuity plus relationship" among the predicates. "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of *continuing* racketeering activity." *H.J.*

*Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). The Court went on to give an example of when this continuity requirement would be met:

"Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves [may] include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* 109 S.Ct. at 2902.

This language indicates that the predicate crimes charged to Sweeton, as indeed those charged to all appellants, meet the continuity requirement. The clear evidence is this case is that Sweeton's activities took place as part of the LeQuire enterprise's smuggling operations. This organization had smuggled drugs in the past, and continued to do so after the incident Sweeton was involved in. The threat of continuing racketeering activity was present, and was, in fact a threat fulfilled. That Sweeton's acts were in close temporal proximity and related to a single importation scheme does not prevent them from fulfilling the pattern requirement of "continuity plus relationship" in light of the clear statement from the Supreme Court.

## IV.

### UNINDICTED ACTS

Roundy makes essentially two arguments with regard to the introduction into

---

**23.** We also note our holding *supra* that the evidence clearly shows Roundy's agreement to the overall RICO conspiracy. Therefore his conviction also rests on the predicate crimes committed by other coconspirators whose actions he agreed to. *See United States v. Carter*, 721 F.2d 1514, 1530–1531 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984) ("[W]hen a defendant agrees to become a member of a conspiracy with the essential RICO objective, ... proof that the defendant agreed to *personally* commit two predicate acts is not necessary.") Certainly appellant can not maintain that his Travel Act violation on August 1st and that of Lee Curry on August 3rd, both in connection with the August 3rd importation into Montgomery, merge into one violation despite the fact that they occurred on different days.

evidence of unindicted crimes in his case. On an initial level he challenges their admissibility, and the constitutionality thereof, and he further charges that the District Court improperly used them as predicates to support his RICO conviction. Roundy refers to instances of testimony regarding flights to Colombia and back that he allegedly piloted, as well as of his activities at Maierhoffer's fixed base operation and in Maine. Roundy entered and perfected a continuing objection to this testimony and the issue is properly before this court. We deal with his contentions in reverse order.

 Roundy's argument that his conviction rests on uncharged predicate crimes relies in part on his claim that the predicates alleged to him merge at law. We have already dismissed his merger contention above, thus his own actions constitute two predicate offenses. From our preceding discussion regarding the sufficiency of the evidence *supra*, it is also clear that the evidence is adequate to show Roundy's agreement to the overall conspiracy, thus the predicate crimes of other conspirators can also serve as predicate acts for appellant's RICO conviction. In particular, we cite Lee Curry's Travel Act violation in connection with the August 3rd scheme which Roundy was shown to be closely tied to. In sum, there is clearly evidence of Roundy's agreement to at least two listed and indicted predicate acts.[24]

 Roundy also contests the admissibility of these uncharged crimes since they are not listed as predicate crimes in the indictment. The acts, such as his activities as a pilot, are clearly admissible nonetheless. In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy. The evidence introduced showing Roundy to have piloted flights other than those charged as predicates, as well as his repeated presence at LeQuire's and Maierhoffer's, while not to be used as RICO predicates, are clearly relevant and admissible to proving RICO's other elements. *See H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) ("[C]ontinuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."); *United States v. Fine-*

---

**24.** Appellants in each of their briefs make much of the fact that certain predicate crimes and "objects of the conspiracy" listed in the indictment named them specifically and others did not. It is not the case though, despite their contentions, that they are only charged with predicates in which they are named. Count I, the RICO conspiracy charge, alleged that defendants:

"did unlawfully and knowingly, combine, conspire, confederate, agree ... to violate Title 18, United States Code, Section 1962(c), ... and did agree to participate in the affairs of the enterprise through the commission of acts in a pattern of racketeering activity as defined by Title 18, United States Code, Section 1961(5).

The pattern of racketeering activity consisted of those acts charged in Counts II through IV which are incorporated by reference herein."

By its literal terms then, the indictment makes each predicate act and the entire pattern set out in Count II applicable to each defendant. Additionally, in its "Objects of the Conspiracy" section the indictment alleged:

1. It was an object of the conspiracy that the defendants and their co-conspirators would conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the commission of acts in a pattern of racketeering activity as defined by Title 18, United States Code, Section 1961(5).

This language also makes each predicate act, and all of them, applicable to each defendant. Subsequently, the indictment in the same "Objects of the Conspiracy" section also charged that:

It was *further* an object of the conspiracy that defendant [NAMED DEFENDANT] would commit and agree to commit racketeering acts [NUMBERED], as charged in Count II of this indictment...." (emphasis added)

The use of the word "further" makes it clear that the indictment does not charge each defendant with exclusively the there enumerated racketeering predicates. Therefore appellants' RICO conspiracy convictions can properly rest on any predicate acts the evidence to which sufficiently indicates that they agreed. *See United States v. Carter*, 721 F.2d 1514, 1530–1531 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984) (For a RICO conspiracy it is not necessary that a defendant agree to personally commit two predicate acts; his agreement to their commission by others is sufficient.)

*stone,* 816 F.2d 583, 587 (11th Cir.), *cert. denied,* 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987) (Uncharged acts were "admissible to prove the membership and participation in the RICO conspiracy."); *United States v. Neapolitan,* 791 F.2d 489, 501 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986) (Acts not appearing in the indictment "would be admissible as circumstantial evidence that Neapolitan was a member of a conspiracy."); *United States v. Kaplan,* 886 F.2d 536, 549 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990) (Testimony concerning unindicted acts allowed to establish continuity). The trial judge in this case clearly instructed the jury to consider as predicates only those crimes so listed in the indictment, and that other evidence introduced was limited to finding of continuity or of the nature and scope of Roundy's agreement.[25]

▮▮▮ Lastly Roundy states that the use of the evidence regarding uncharged acts violated the procedural "notice" function fulfilled by a criminal indictment. This court has held that an indictment is sufficient if it sets forth "the elements of the offense in a manner which fairly informs the defendant of the charges against him." *United States v. Elkins,* 885 F.2d 775, 782 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990), *relying on Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). All the evidence complained of by Roundy is explicitly referred to in the indictment in sections other than that con-

cerning predicate acts. Roundy's role as a pilot on numerous flights was clearly stated in the "Overt Acts" section. Appellant no doubt knew which witnesses were to testify against him and what their likely testimony might be. He can make no claim that he was prejudicially surprised or that he did not have fair notice of what the government intended to introduce against him. Despite Roundy's complaint, we hold that the indictment has "sufficiently appris[ed] the defendant of what he must be prepared to meet." *Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1961).

## V.

## STATUTE OF LIMITATIONS

▮▮▮ Sweeton argues that his conviction is barred by means of application of the statute of limitations. He contends that the indictment and proof at trial show his RICO conviction to rest on predicate crimes committed on May 23, 1983. The indictment was not brought until July 29, 1988, and thus Sweeton argues that it falls outside the applicable five-year statute of limitations, 18 U.S.C. § 3282, the general federal limitations statute. Sweeton's contention is dealt with by prior case law in this circuit.

In *United States v. Coia,* 719 F.2d 1120, 1124 (11th Cir.1983), *cert. denied* 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984), we held that the RICO conspiracy statute, unlike the general federal conspiracy stat-

---

**25.** The District Court, in its orders denying Roundy's post trial motions described its jury charges thusly:

"The instant case is even more difficult since the Government presented evidence of other acts of racketeering committed by [Roundy]. However, the jury's consideration of these acts was limited to a finding of continuity or a threat thereof. Since the Government did not allege these acts in the indictment, the jury could not consider them in finding that [Roundy] had committed two separate acts to form a pattern of racketeering activity."

. . . "the Court did not consider the 'unalleged predicate acts' as 'predicate acts' for purposes of weighing the sufficiency of the evidence as to Count I. Rather, the Court specifically

stated that the acts submitted into evidence were charged as overt acts. It is immaterial that the overt acts also may have been crimes since the Court specifically instructed the jury that they must only consider the predicate acts alleged in the indictment for purposes of determining the 'pattern' element of the RICO conspiracy. The jury could consider the alleged overt acts to determine the nature and scope of [Roundy's] agreement to participate in the RICO conspiracy. From the evidence presented, the jury could properly find that defendant Roundy agreed to the commission of two or more of the specified predicate acts listed in Count II of the indictment which were committed by co-defendants and which were incorporated by reference into Count I."

ute, but consistent with the common law of conspiracy, did not require an overt act. *Coia* further established the rule that "[w]ith respect to conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period." *Id.* We reaffirmed this principle in *United States v. Butler*, 792 F.2d 1528, 1532 (11th Cir.), *cert. denied*, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986), stating: "We hold that on a non-overt-act conspiracy charge the indictment satisfies the requirements of the statute of limitations if the government alleges and proves, at trial or pretrial, that the conspiracy continued into the limitations period." *Id.* Thus Sweeton's premise, that because his predicate crimes predated the return of the indictment by more than five years, the statute of limitations is violated, misapplies the rule in this Circuit. Neither the predicate acts, nor any overt acts, are mentioned in the *Coia* statute of limitations analysis, only the conspiracy need continue into the limitations period. In determining whether the conspiracy itself continued, we are again guided by *Coia:* "The conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished." *Id.* at 1124. Furthermore, the conspiracy "is presumed to exist until there has been an affirmative showing that it has terminated." *Id.* at 1125, *citing United States v. Mayes*, 512 F.2d 637, 642 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975).[26]

The evidence in this case shows that Sweeton's conspiracy, that involving the May 23rd importation, continued well past the date of his involvement. The majority of the members involved, including Le-Quire, the pilots, and most of the ground crew not shot, remained at large and continued to associate together. LeQuire and others, including load crew members, cooperated in the investigation of the "ripoff" by the Herrera organization. Many of the same conspirators participated in smuggling a mid-July load of cocaine apparently also destined for the Herrera group. Pilots and members of the ground crew had discussions with LeQuire as to when and how much, and indeed if, they would be paid for the disastrous May 23rd attempt. Most significant though, are Sweeton and Ward's own false stories to GBI Agent Stone about why they were at the Plantation Park Airport and what happened. Their matching alibis show that the conspiracy, and more particularly Sweeton's agreement to it, continued beyond May 23, 1983. In *United States v. Corona*, 885 F.2d 766 (11th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990), which like the present case involved a RICO conviction based upon Travel Act and drug charges, we noted that activities occurring after an enterprise's break-up were relevant in determining the accrual of the limitations period. There, as here, the "unlawful activity had merely moved into a new phase: avoidance of prosecution and punishment." *Id.* at 771–72. The evidence of continuance of the *Corona* conspiracy included dealings with drug customers and buyers, payments of debts, and avoidance of justice as a fugitive with a false identity. *Id.* The evidence in the present case is analogous to that found sufficient in *Corona*, particularly the cooperation with Herrera's investigation of the "ripoff", the payment of the pilots and the load crew, and Ward and Sweeton's cover-up story at the hospital. Thus we hold that there is evidence to satisfy *Coia's* test that the conspiratorial purposes had neither been abandoned nor accomplished, and the conspiracy could be deemed to have continued into the limitations period.[27]

---

**26.** We also agree with the language of the District Court in *United States v. Persico*, 621 F.Supp. 842 (S.D.N.Y.1985) that when "the § 1962(d) *agreement* extends into the limitations period, it satisfies the requirements of the statute of limitations." *Id.* at 872, *citing* our holding in *Coia*, 719 F.2d at 1125–25. (emphasis added to show the New York court's use of the word "agreement" in place of *Coia's* term "conspiracy").

**27.** Sweeton's intimation of a defense based upon withdrawal, though not raised at trial, must fail as well. The law of withdrawal is well-settled in that the defendant bears a substantial burden in showing that he undertook

## VI.

## PROSECUTORIAL MISCONDUCT

■ Appellant Gonzalez alleges error in the District Court's denial of his motion for mistrial based upon a prosecution witness' testimony regarding his refusal to answer questions after receiving his *Miranda* warnings. The incident Gonzalez objects to refers to testimony of United States Customs Service Special Agent Everett Eledge. Special Agent Eledge was being questioned as to the circumstances regarding the arrest of Gonzalez. The agent testified to the fact that Gonzalez had been read his *Miranda* warnings. The following question and answer then occurred:

Question [by prosecutor]. All right. After advising him of those particular rights, what was his response?

A. He didn't want to answer any questions regarding the criminal charges against him.

The defendant's attorney promptly objected, and in an immediate side bar, made a motion for mistrial. After hearing from both sides, the court denied the motion and, back in the presence of the jury, issued a curative instruction focusing on a suspect's right to remain silent prior to consulting with an attorney. Special Agent Eledge's testimony then continued, showing that Gonzalez did answer some questions relating to his identity, citizenship and ownership of property.

It is well settled that prosecutorial comment on an accused's silence for substantive or impeachment value is constitutionally, or otherwise, prohibited. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that impeachment use of a defendant's post-arrest silence violates the Due Process clause of the Fourteenth Amendment and found reversible error. Previously in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), the Court had used its supervisory powers over federal courts to find reversible error when the trial court permitted cross-examination of a defendant concerning his post-arrest silence. The Court held that such evidence on silence was inadmissible because its probative value was substantially outweighed by its prejudicial effect. Special Agent Eledge's answer in this case clearly constitutes an impermissible reference to an accused's exercise of his right to remain silent.

Such error is not necessarily fatal. This Circuit has held that the harmless error doctrine is applicable to unconstitutional comment on silence. *United States v. Pena*, 897 F.2d 1075, 1082–83 (11th Cir. 1990); *Martire v. Wainwright*, 811 F.2d 1430 (11th Cir.1987); *both relying on United States v. Meneses–Davila*, 580 F.2d 888 (5th Cir.1978). In applying the harmless error doctrine to silence cases this Circuit has looked to "an examination of the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the defendant's guilt." *Pena*, 897 F.2d at 1082; *Sullivan v. Alabama*, 666 F.2d 478, 485 (11th Cir.1982) *both citing from Meneses–Davila*, 580 F.2d at 890. Using this analysis for the case at hand, we conclude that the remark complained of was harmless error.

The testimony accounted for one sentence and only a few moments during an eight-day trial involving multiple defendants and charges. No other instances of misconduct, of this sort or any other, occurred or were complained of. The prosecutor did not focus on, nor emphasize Special Agent Eledge's response, or Gonzalez's silence. Indeed apart from this one instance there is no further mention of Gonzalez's silence. The prosecutor did not return to this testimony either while questioning other witnesses or upon closing argument. Agent Eledge's response was not

affirmative steps to defeat the conspiratorial objective and either communicated those acts to his co-conspirators or disclosed the illegal scheme to law enforcement authorities. *See, e.g., United States v. United States Gypsum Co.,*

438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). Sweeton's matching and apparently false alibi in the hospital defeats any claims he might make as to withdrawal.

intentionally elicited by the prosecutor.[28] The improper answer was quickly objected to and a curative instruction was promptly given to the jury. Further jury instructions by the court at the trial's start and in closing also highlighted defendant's general right to silence and to not testify.[29] Additionally, as mentioned in our discussion concerning Gonzalez's evidentiary challenges, the evidence is otherwise strong to clearly indicate his involvement and agreement to the conspiracy.

Cases in this Circuit have looked to these and other similar circumstances in holding instances of improper comment to be harmless error. *See United States v. Magdaniel–Mora*, 746 F.2d 715, 722 & 724, (11th Cir.1984) (Noting fact that comment was not used for impeachment, was offered by a witness rather than the prosecutor, and dealt with failure to speak at sometime before trial, not during trial); *Sullivan*, 666 F.2d at 485 (Comment not used for impeachment purposes, only one reference and otherwise strong evidence of guilt); *Pena*, 897 F.2d at 1083 (Only momentary comment during a four-day trial, otherwise strong evidence against defendant).

It is true that the cases relied upon by appellant, *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), *United States v. Impson*, 531 F.2d 274 (5th Cir.1976) and *United States v. Henderson*, 565 F.2d 900 (5th Cir.1978) found reversible error in prosecutorial comment upon the silence of an accused, and further held that curative instructions had no controlling significance. However, two of these cases did not purport to apply the harmless error doctrine and hence, upon a finding of error, mandated reversal.[30] In *Hale* the Supreme

---

**28.** It is often difficult to get the full flavor of trial proceedings from a transcript. This is particularly so in cases such as this involving objections because interruptions and incomplete sentences predominate and indications of tone and inflection do not appear in the transcript. It appears though that the prosecutor had not intended to question Agent Eledge in detail about the *Miranda* warnings and Gonzalez's silence. She appears to be starting to ask the witness about those questions Gonzalez did answer at the time of his arrest. Defense counsel then objected and requested that the witness go into the *Miranda* rights. After the prosecutor thus elicited more detail from Agent Eledge concerning the warnings given Gonzalez, particularly those dealing with the right to counsel, she began to return to questioning regarding the information Gonzalez did volunteer at the time of his arrest. It was at this point that Agent Eledge improperly commented upon appellant's silence. While we decline to call this "invited error", it is nonetheless evident that the prosecutor had not intended Agent Eledge to focus on Gonzalez's post-arrest refusal to answer questions, but rather on the questions regarding citizenship and property holdings which he did answer.

**29.** Gonzalez attempts to argue that the court's immediate curative instruction is ineffective because it instructs upon a defendant's right to counsel, not the right to silence. We do not view the situation so. Agent Eledge's testimony immediately preceding the error discussed the *Miranda* warnings given Gonzalez and focused on the right to an attorney. His challenged statement that "[Gonzalez] didn't want to answer any questions ..." could be seen as an invocation of either, or both, his Fifth and Sixth Amendment rights. The court's instruction

dealing with the right to silence until counsel is present adequately cautions the jury as to any improper inferences from defendant's silence. Further we note, as above, that relevant instructions were also given at the opening and closing of trial as well.

**30.** In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) the Supreme Court held the harmless error doctrine generally applicable to most Constitutional violations. *Chapman* dealt with a prosecutor's improper comment on a defendant's failure to testify at trial. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) the Court held prosecutorial comment on an arrestee's silence after receiving his *Miranda* warnings was similarly constitutional error. Since then the Court has not had occasion to specifically apply harmless error in a case dealing with comment on post-arrest silence similar to these facts. The Court though has clearly approved such an analysis. *See Doyle*, 426 U.S. 610, 620, 96 S.Ct. 2240, 2246, 49 L.Ed.2d 91. (Harmless error was not raised by the government and was not considered on review); *Wainwright v. Greenfield*, 474 U.S. 284, 295 n. 11, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (Same); *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 3109 & n. 7, 97 L.Ed.2d 618 (1987) (Deciding case on other grounds but otherwise approving appellate court's harmless error analysis.) As discussed in the text, current cases in this Circuit clearly use a harmless error analysis. *See, e.g., United States v. Dixon*, 593 F.2d 626 (5th Cir.), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979); *Menses–Davila*, 580 F.2d 888 (5th Cir.1978); *United States v. Davis*, 546 F.2d 583 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).

Court made the finding that the probative value of defendant's silence was outweighed by its prejudicial effect and did not address the possible Constitutional issue involved and therefore had no occasion to apply the harmless error doctrine. *Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99. *Henderson* cited and relied heavily on *Hale* and was also decided on non-constitutional grounds. *Henderson*, 565 F.2d at 906.

Furthermore, in these cases, defendants each took the stand and presented alibi defenses. Thus in the relied upon cases the prosecutorial comment had a dual impact: one, the inference that because defendant is silent he is guilty or hiding something; and two, that defendant must have fabricated his alibi between arrest and trial because otherwise he would have told it to the police the first time. This fact that the comment on silence is particularly damaging to a defendant presenting an alibi defense was important in the *Impson* court's holding that the error was not harmless. *Impson*, 531 F.2d at 277. The latter sort of prejudice is clearly not applicable to the instant case, since Gonzalez is not now testifying to any alibi which he might have been silent as to during his arrest.

Finally, we note that in other contexts this Circuit has held that prosecutorial misconduct did not warrant a new trial unless "so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Creamer*, 721 F.2d 342, 345 (11th Cir.1983). The touchstone of due process analysis is the fairness of the trial. *United States v. Rivera*, 775 F.2d 1559, 1563 (11th Cir.1985), *relying on Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (1982). The witness' one remark complained of in this case was not so substantial as to taint the overall fairness of Gonzalez's trial.

## VII.

### CONCLUSION

Having considered all of appellants' contentions, we find the case offered against these appellants sufficient in fact and at law to sustain their convictions.

AFFIRMED.